Karen EVERETT, and Marion Mickens, individually and on behalf of their children and on behalf of all other persons similarly situated, Plaintiffs,

v.

Patricia SCHRAMM, in her official capacity as Secretary of the Delaware Department of Health and Social Services, and Charles Hayward in his official capacity as Director of the Department's Division of Economic Services, Defendants.

Civ. A. No. 83–209–WKS.

United States District Court,
D. Delaware.

April 24, 1984.

**230**

Joshua M. Spielberg, Community Legal Aid Society, Inc., Wilmington, Del., for plaintiffs.

Matthew J. Lynch, Jr., Esquire, Deputy Atty. Gen., Dept. of Justice, Wilmington, Del., for defendants.

## OPINION

STAPLETON, Chief Judge:

The plaintiffs in this class action,[1] Delaware residents who are or have been recipients of assistance under the Aid to Families with Dependent Children (AFDC) program since October 1981, allege that this assistance has been or will be illegally reduced or terminated by the defendants pursuant to 42 U.S.C. §§ 602(a)(18) and 602(a)(31). Defendants Schramm and Hayward are state officials who administer the AFDC program in Delaware. Plaintiffs allege that the terminations or reductions of their benefits are not based on Delaware's "standard of need," as federal law requires, and that defendants have violated various provisions of state law as well. Plaintiffs seek declaratory and injunctive relief. The parties filed cross-motions for summary judgment. This opinion addresses those motions.

## I. BACKGROUND

AFDC is a public assistance program undertaken jointly by the federal and state governments.[2] Under the program, financially needy households which include dependent[3] children receive monetary payments. The amount paid depends upon household size and income. 42 U.S.C. § 602(a)(7).

States must set two standards for the program: the standard of need and the payment level. The standard of need is a set of amounts each state considers adequate to provide for subsistence needs for various sizes of households. It is a measurement of the cost of satisfying basic needs. While federal law requires that the standard of need reflect the cost of living as of 1969,[4] it does not mandate any adjustment to account for inflation that has occurred since 1969. *New Jersey Welfare Rights Organization v. Cahill,* 483 F.2d 723, 726 (3d Cir.1973). The payment levels, in contrast, are the amounts the state actually pays to eligible households. The amounts paid vary with the number of household members and the amount of the household's other income. A household with no income from any source other than the program receives an amount equal to the full payment level for a family of that size. A family with other income receives an amount equal to the payment level, less the amount of other income. 42 U.S.C. § 602(a)(7).

The payment levels set by states need not be equal to their standards of need.

---

**1.** Pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure, this Court certified a plaintiff class consisting of

All Delaware applicants for and recipients of assistance under the AFDC program, since October 1981, who either (a) have been or will be determined ineligible because their gross incomes exceed 150% of Delaware's "payment level" rather than Delaware's true "standard of need," or (b) have been or will be determined ineligible or had or will have their grants reduced because in calculating what portion of step-parent income is considered

available to them, Delaware's "payment level" rather than its true "standard of need" is used.

**2.** Title IV–A of the Social Security Act, 42 U.S.C. § 601 *et seq.* (1974 and Supp.1982), authorizes and describes the AFDC program.

**3.** A dependent child is a child with at least one deceased, incapacitated, or absent parent. 42 U.S.C. § 606.

**4.** 42 U.S.C. § 602(a)(23).

The federal statute specifically allows states to set their payment levels at a percentage of their standards of need. 45 C.F.R. § 233.20(a)(2)(ii). The purpose of setting a standard of need is not, therefore, to insure that recipients of benefits receive an amount necessary for basic subsistence. Rather, the standard of need serves as a benchmark against which to measure the adequacy of the payment levels. The Supreme Court explained the relationship between the standard of need and the payment level this way:

> [W]hile [the statutory provisions governing the setting of payment levels] leaves the States free to effect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequences of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptance.

*Rosado v. Wyman*, 397 U.S. 397, 413, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970).

The standard of need assumed additional significance in 1981 with the passage of the Omnibus Budget Reconciliation Act (OBRA), Pub.L. 97–35, § 2302, 95 Stat. 357 (1981). The OBRA affected AFDC applicants and recipients with two types of income: (1) those with earned income, and (2) those with income from stepparents. First, the OBRA declared automatically ineligible for AFDC benefits any household whose gross income exceeded 150 percent of the state's standard of need. Second, the OBRA required the states to assume that stepparents contribute a certain part of their income to the household, regardless of how much actually is contributed, for purpose of calculating the amount of household income to be subtracted from the payment level. 42 U.S.C. § 602(a)(31). The amount assumed to be contributed by the stepparent to the household is calculated by starting with the stepparent's income and disregarding a certain amount of that income. The amount disregarded includes an amount equal to the state's standard of need for a household of the number of people the stepparent actually supports.

The situations of the named plaintiffs illustrate the effects of these changes. In January 1983, Karen Everett was receiving a monthly AFDC grant of $197 for herself and her daughter. She then began part-time work which brought her an average gross monthly income of approximately $400. Delaware's standard of need for a family of two, Ms. Everett was informed, was $197. Her $400 income exceeded 150 percent of $197, or $295.50. The state therefore terminated her benefits. Marion Mickens was receiving a monthly AFDC grant of $266 for herself and her two children when she married Charles Mickens in February of 1983. Mr. Mickens had an income at that time of approximately $400 per month. Calculations required by Section 602(a)(31) were done to determine how much of this stepparent income would be assumed to be available to Mrs. Mickens and her children. The amount of Mr. Mickens' income disregarded was $197, the standard of need for a household of two. Since only $197 was disregarded, enough of Mr. Mickens' income was left and assumed to be available to Mrs. Mickens and her family that her benefits were terminated.

Mention of several acts of the Delaware General Assembly completes the background of the issues for decision. In 1970, when the General Assembly revised Delaware's Public Assistance Code, it included the following administrative provisions:

> The Department [of Health and Social Services] shall administer this chapter and in connection therewith shall:
>
> (1) Establish rules and regulations to carry out the provisions of this chapter, including rules, regulations and standards as to eligibility for assistance and as to its nature and extent;
>
> (2) Cooperate with the Federal Department of Health, Education and Welfare or with any successor department or agency thereof, in any reasonable manner not contrary to law, as may be required to qualify for federal aid with respect to functions and programs com-

ing within the purview of this chapter,
. . .

(3) Make periodic surveys of cost of living factors in relation to the needs of recipients of assistance and welfare services, in order that the standards for such assistance and welfare services may be reasonably sufficient to provide recipients with a subsistence compatible with recognized scientific standards.

31 Del.C. § 512; 50 Del.Laws, c. 278, § 5.

In 1971, the General Assembly enacted another statute which provided as follows:

The standard of need for old-age assistance, aid and services to needy families with children, aid to the blind or aid to the permanently and totally disabled shall be adjusted upward simultaneously with any percentage increase in old-age, survivors and disability insurance as provided by Title II of the Social Security Act, as amended [42 U.S.C.A. § 402 et seq.]. The dollar amount of increased adjustment of this standard of need shall be the same as the dollar adjustment of the increase in old-age survivors and disability insurance.

58 Del.Laws, c. 135, § 2; 31 Del.C. § 509.

In June of 1983, the General Assembly repealed this statutory provision when it enacted Senate Bill 209 (S.B. 209). S.B. 209 explicitly set Delaware's standard of need effective January 1, 1984. It reads:

The standard of need for aid to families with dependent children on and after January 1, 1984, shall be as follows, based on family size: one person household—$152 per month; two person household—$212 per month; three person household—$287 per month; four person household—$336 per month; five person household—$416 per month; six person household—$475 per month; seven person household—$534 per month; and $54 dollars per month for each additional person, beyond seven, in the household who qualifies for assistance.

Plaintiffs argue that the defendant state officials have violated federal and state law in several ways. First, they claim that the termination and denial of benefits to the plaintiff class from 1981 through 1983 violated federal law because they were not based on Delaware's true standard of need. Although defendants were not *required* to update their standard of need to keep pace with inflation, plaintiffs argue that the record shows that the defendants in fact have done so numerous times. Having done so, plaintiffs contend, defendants must use these updated amounts in calculations required under the 150 percent and stepparent income rules. In the alternative, plaintiffs argue that defendants have violated Section 512(3) by not having conducted a required "periodic" cost of living survey since 1968. The final point in plaintiffs' first argument is that if the defendant officials did not update the state's standard of need, there was an automatic updating by virtue of the legislative directive found in Section 509.

Plaintiffs' second argument is that the state's standard of need for 1984 set by S.B. 209 is inconsistent with the definition of standard of need under state law and under federal law.

## II. DELAWARE'S STANDARD OF NEED FROM 1981 THROUGH 1983

Plaintiffs contend that although defendants were under no obligation to adjust Delaware's standard of need to keep pace with inflation, defendants have, in fact, done so. Defendants must, the argument runs, use these updated amounts in making calculations under 42 U.S.C. § 602(a)(18) and (31). As evidence for this claim, plaintiffs point to pieces of correspondence between defendants and concerned citizens,[5] the fiscal year 1984 Budget Request of the Delaware Department of Health and Social Services,[6] a document[7] which plaintiffs say represents the defendants' calculations con-

---

**5.** *See* Plaintiff's Appendix to their Answering and Opening Brief, Dkt. No. 43A, at A 54–58.

**6.** *Id.* at A 60–66.

**7.** *Id.* at A 69.

cerning an AFDC payment level increase, a newspaper article quoting the defendants, a letter from defendant Schramm to a state legislator,[8] and the Delaware Department of Health and Social Services' fiscal year 1980 budget fact sheet.[9] These documents, plaintiffs say, show that in practice defendants have updated their standard of need by taking the cost of living in 1969 as a base year and by using the Philadelphia-area Consumer Price Index to calculate how much the cost of living increased from 1969 to whatever year is being discussed in the documents. The defendants use the phrase "standard of need" throughout these documents to describe the cost of living in a particular year. This number is then compared in these documents to an existing or proposed standard. The goals of defendants in these documents seem to be to show how adequate the current payment levels are or how proposed payment levels would help recipients to meet the cost of living in a particular year. That the defendants calculate such numbers and call them "standards of need" in such contexts does not, however, prove that these figures represent, as plaintiffs claim, the state's "true" standard of need.

A state that participates in the AFDC program receives federal money only if the state has submitted to the Secretary of the U.S. Department of Health and Human Services a plan "for aid and services to needy families with children." 42 U.S.C. § 601. The Secretary must approve the plan. *Id.* The state's plan must contain both payment levels and a standard of need. In Delaware the task of preparing such a plan and of determining the amount of assistance to be received by eligible families has been assigned by the General Assembly to Delaware's Department of Health and Social Services. *See* 31 *Del.C.* §§ 502(8), 512(2) and (6). The defendants point out that the Department has submitted such a plan to the federal government and has amended it from time to time with the approval of the Secretary. Delaware's plan set the original "standard of need" in 1968; it was thereafter increased by the filing of amendments in fiscal 1972 and again in fiscal 1979. Plaintiffs do not contest this fact.

■ Plaintiffs acknowledge that Delaware's plan has consistently set out standard of need figures and that the standard of need figures currently set forth in the plan take account of pre-1969 inflation. Moreover, plaintiffs in response to defendants' motion for summary judgment based upon the provisions of the plan, are unable to point to any official action of the Department purporting to change the standard of need figures contained in the plan or to any instance in which assistance has been paid or any other action taken by the Department in a manner inconsistent with the view that Delaware's standard of need is that set forth in the plan. Accordingly, it seems apparent that the defendant officials have not formally or through practice effected an amendment to the standard of need.[10]

**8.** *Id.* at A 71.

**9.** *Id.* at A 72–74. Plaintiffs cite other documents as well, but they are devoid of any arguable support for plaintiff's argument.

**10.** It has been held that a state's standard of need may be altered by state actions not reflected in its plan. In *Coleman v. O'Bannon,* 550 F.Supp. 195 (E.D.Pa.1982), *aff'd* 692 F.2d 748 (3d Cir.1982), the Court faced the issue of what constituted Pennsylvania's standard of need as that term was used in the OBRA. The Court rejected the defendants' argument that it need only look at the plan Pennsylvania had submitted to, and adopted by, the federal government. It determined that the state's standard of need was the "updated Woodbury Standard" which was not mentioned in the state's plan. *Id.* at 196. The Woodbury Standard was developed by a committee appointed by the Secretary of Pennsylvania's Department of Public Assistance in 1955 to determine the amount a Pennsylvania family needed to maintain a minimum standard of health and decency. *Id.* at 196 note 1. The Court found that Pennsylvania's Department of Public Welfare had actually used the Woodbury Standard numerous times as Pennsylvania's standard of need. *Id.* at 198. Moreover, the Department of Public Welfare had been making regular, semi-annual updates of the Woodbury Standard. The evidence before the Court in *O'Bannon* was thus qualitatively different from the evidence here.

Plaintiffs argue alternatively that if the defendants did not update Delaware's standard of need, they should have done so. They acknowledge that federal law does not impose such a duty but contend that Section 512(3) obligated defendants to conduct periodic surveys of cost of living factors and to adjust their standard of need in accordance with their findings. Any terminations or denials of benefits using a non-updated standard of need, plaintiffs contend, would therefore be invalid under state law. Regardless of the merits of this argument, the principles outlined in *Pennhurst State School and Hospital v. Halderman (Pennhurst II)*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) preclude its consideration.

*Pennhurst II* was the Supreme Court's second opinion in a lengthy and complex litigation. In *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981) (*Pennhurst I*), the Court reversed a decision by the U.S. Court of Appeals for the Third Circuit. The Court of Appeals had concluded that the bill of rights provision in the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 610, gave residents of Pennhurst the right to habilitation in the least restrictive environment. The Supreme Court disagreed, and remanded the case to the Court of Appeals to determine if the remedial order could be supported on the basis of state law, the United States Constitution, § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1976 ed. and Supp. V), or other provisions of the Developmentally Disabled Assistance and Bill of Rights Act. 451 U.S. at 27–31, 101 S.Ct. at 1544–47. On remand, the Court of Appeals concluded that a state statute, the Pennsylvania Mental Health and Mental Retardation Act of 1966, 50 *Pa.Stat.Ann.* §§ 4401–4704 (Purdon 1969 and Supp.1982) (MH/MR Act), fully supported its prior judgment. 673 F.2d 647 (1982). In reaching its conclusion, the Court of Appeals rejected the argument that the Eleventh Amendment barred a federal court from considering a pendent state-law claim, such as one based on the

MH/MR Act, citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and *Siler v. Louisville and Nashville R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909).

In *Pennhurst II*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67, the Supreme Court declared that the Eleventh Amendment prohibited a federal court from ordering state officials to conform their conduct to state law. The Court said that the Eleventh Amendment established that an unconsenting state is immune from suits brought in federal courts by its own citizens or those of another state or a foreign state. —— U.S. at ——, 104 S.Ct. at 907. The holding in *Ex Parte Young, supra,* recognized an important exception to this rule: "a suit challenging the constitutionality of a state official's action is not one against the State." *Id.* Despite the obvious impact of such suits on the state, the Court said, "the Young doctrine has been accepted as necessary to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" *Id.* at ——, 104 S.Ct. at 910. These considerations are not present, however, where the challenge to the state official's conduct is based on *state* law.

> This need to reconcile competing interests is wholly absent, however, when a state official has violated *state* law. In such a case the entire basis for the doctrine of *Young* ... disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment. We conclude that *Young* ... [is] inapplicable in a suit against state officials on the basis of state law.

*Id.* The Court then went on to say that the same reasoning applied to relief requested

against state officials on the basis of a pendent state-law claim.

[C]ontrary to the view implicit in decisions such as [*Louisville & Nashville R. Co. v. Greene*, 244 U.S. 522, 37 S.Ct. 683, 61 L.Ed. 1291 (1917)], neither pendent jurisdiction nor any other basis of jurisdiction may override the Eleventh Amendment. A federal court must examine each claim in a case to see if the court's jurisdiction over that claim is barred by the Eleventh Amendment. We concluded above that a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment. *See supra*, at 15 [at 908]. We now hold that this principle applies as well to state-law claims brought into federal court under pendent jurisdiction.

*Id.* at ——–——, 104 S.Ct. at 919.

■ The rationale of *Pennhurst II* forecloses me from considering plaintiffs' argument that a failure to update Delaware's standard of need violates Section 512(3).[11]

■ Different principles apply to plaintiffs' argument based on Section 509, however. The eligibility requirements spelled out in the OBRA are matters of federal law which this Court has the responsibility of enforcing. Those requirements make reference to and incorporate the standard of need set by each state pursuant to state law, but this does not make those requirements any less a matter of federal law. Accordingly, if the effect of Section 509 under Delaware law was to adjust Delaware's standard of need "simultaneously with any percentage increase in old age, survivors and disability insurance as provided by Title II of the Social Security Act," the defendants have violated federal law by applying the OBRA in a way that ignores that fact. The defendants contend that Section 509 does not apply to the AFDC program, that Section 509 was implicitly repealed in 1974 and that there cannot be a legal standard of need which is not set forth in the state plan accepted by the Secretary. I cannot accept any of these contentions.

■ Contrary to defendants' first contention, the fact that Section 509 refers to "aid and services to needy families with children," rather than to the "aid to families with dependent children program" does not reflect an intention to exclude AFDC from the scope of that section. Prior to 1968, what is now called the AFDC program was called aid and services to needy families with children and was found at Title IV of the Social Security Act.[12] In 1968, when Congress added two new components to this title of the Social Security

---

**11.** Counsel submitted written comments on the effect of *Pennhurst II* on the pending motions. Plaintiffs' counsel advanced two principal arguments. First, plaintiffs allege that this case comes within the *ultra vires* exception, noted by the Supreme Court at —— n. 11 and —— n. 25, 104 S.Ct. at 908 n. 11 and 915 n. 25. The Supreme Court viewed the *ultra vires* exception very narrowly; "a state officer may be said to act *ultra vires* only when he acts 'without any authority whatever.' The state officer must completely lack delegated power; error in the exercise of delegated power is not enough." —— n. 11, 104 S.Ct. 908 n. 11. In this case, Section 512 itself delegated to the Department the power to set Delaware's standard of need. Plaintiffs contend that defendants' using the state's standard of need without updating the standard as required by § 512(3) was an action without any authority. While the use of standards not updated as § 512(c) may require may have been erroneous, and in violation of state

law, this does not mean defendants had no authority to use them. Second, plaintiffs argue that they are entitled to declaratory relief on their state law claims because such relief is not coercive and, accordingly, would not operate against the state. While a declaratory judgment is less coercive than an injunction, it would aid plaintiffs only to the extent state officials saw fit to draw upon state funds in conformity with this Court's decree. For this reason, a suit for a declaratory judgment regarding the obligations of state officials under state law places a federal court in a position where its resolution of the controversy will either be pointless or will conflict "directly with the principles of federalism that underlie the Eleventh Amendment." —— U.S. at ——, 104 S.Ct. at 911.

**12.** Up until 1962, it had been called Aid to Dependent Children (ADC). *See* Pub.L. No. 87–543, § 104(a)(1), 76 Stat. 185 (1962).

Act, it renamed this broadened title "aid and services to needy families with children and for child welfare services;" and it renamed the existing program "AFDC" and made it subdivision IV–A of this broader title. Pub.L. No. 90–248, § 240(a) and (b), 81 Stat. 911 (1968). Changes were made in Delaware's public assistance law to reflect this change in federal terminology. 57 Del. Laws c. 248 (1969). The AFDC program thus created was not a new program, as defendants attempt to characterize it. Rather, it was a slightly revised name for an old program. In fact, the federal statutory scheme still uses the two terms interchangeably in some places.[13] When Section 509 was enacted shortly thereafter in 1971, the Delaware legislature used the old terminology. The obvious intent was either to refer specifically to AFDC (inadvertently using the previous, very similar name of the same program), or to refer to all of Title IV children's services, which, of course would include IV–A (AFDC). Thus, when the legislature used the words "aid and services to needy families with children" in Section 509, it must have envisioned updating the AFDC standard of need; there simply is no other program that this language could possibly be referring to.

■ Defendants also argue that the second paragraph of Section 509 was implicitly repealed as a result of amendments to 31 *Del.C.* § 503(d) in 1974. As defendants note, implied repeals are not favored in Delaware law. *Board of Assessment Review v. Silverbrook Cemetery*, 378 A.2d 619 (Del.Supr.1977); *C. v. C.*, 320 A.2d 717 (Del.Supr.1974). A finding of implied repeal occurs only "when the two statutes are so inconsistent that reconciliation is impossible.... Repugnancy, and not a mere difference in the provisions of the two acts, is the controlling question.... A

court will adopt any reasonable interpretation to avoid a repeal by implication." *Id.* at 721–223. There was no implied repeal in 1974 because the necessary inconsistency between the two acts did not exist. The second paragraph of Section 509 requires that Delaware's standard of need be updated in a specific manner, *i.e.*, consistent with cost of living increases under Title II of the Social Security Act. Section 503(d) as amended in 1974, 59 Del.Laws c. 394, did not affect Delaware's standard of need; rather, it set a floor on Delaware's payment level. It required that the amount of assistance (i.e., payment level) not fall below 80% of a 1968 base figure. Keeping in mind the distinction between standard of need and payment level, this new provision is in no way inconsistent with a standard of need which, under § 509, continues to reflect increases in the cost of living after 1968.

■ Finally, while defendants' argument that federal law forecloses recognition of a standard of need not contained in a plan is a plausible one, I am foreclosed from accepting it by the summary affirmance by the Court of Appeals for the Third Circuit of *Coleman v. O'Bannon*, 550 F.Supp. 195 (E.D.Pa.1982), 692 F.2d 748 (1982). That case found Pennsylvania's standard of need for purposes of the OBRA to be a standard not found in the plan which had been accepted by the Secretary.

■ The record affirmatively establishes that there have been a number of increases in the Title II index referred to in Section 509 which have been ignored by the defendants in applying the OBRA. It follows that defendants violated federal law from 1981 through 1983 and that some members of the class are entitled to relief.[11]

---

**13.** For example, see the last sentence in 42 U.S.C. § 601 and the heading for 42 U.S.C. § 602.

**14.** The parties differ on how the Title II index should be applied to Delaware's standard of need and defendants assert that the difficulty of applying it is a reason for holding it inapplica-

ble. While I agree that the statute is inartfully worded, it is clear that the General Assembly intended Delaware's standard of need to be adjusted simultaneously with each increase in the Title II index and that there is only one feasible way to make such an adjustment. As the first sentence of Section 509 suggests, the index is

## III. DELAWARE'S STANDARD OF NEED FROM JANUARY 1, 1984 TO THE PRESENT

As noted earlier, Delaware Senate Bill 209 was enacted into law on July 12, 1983. This bill changed the wording of 31 *Del.C.* § 503(d), including for the first time a listing in the statute itself of specific dollar amounts for Delaware's standard of need. In addition, S.B. 209 deleted the second paragraph of Section 509 which, as discussed above, tied Delaware's standard of need to the index under Title II of the Social Security Act. S.B. 209 did not, however, change the definition of standard of need under Section 502(8). That section continues to provide that " 'Standard of need' means the subsistence level for a decent and healthful standard of living as set under Section 503 of this Chapter."

Plaintiffs assert that S.B. 209 is invalid (1) because there is "no rational basis for finding that ... [the amounts there set forth] are consistent with ... [the] state law definition" of standard of need (Plaintiffs' Answering Brief p. 20), and (2) because "once a state has imposed upon itself a requirement to update its standard of need, it cannot later reduce the amounts so updated unless it can demonstrate that these new amounts also remain consistent with the required [federal] definition of standard of need." (Plaintiffs' Reply Brief at 14).

■ Plaintiffs first attack on S.B. 209 is mounted on the definition of standard of need set forth in 31 *Del.C.* § 502(8). The argument is that the amounts found by the General Assembly in S.B. 209 to constitute Delaware's standard of need are inconsistent with that definition. This argument, like one earlier discussed, calls upon this Court to require state officials to conform their conduct to state law. Under *Pennhurst II,* I am without authority to do so.

Plaintiffs second contention with respect to S.B. 209, while dependent on the existence of Section 509 between 1971 and 1984, presents a federal question which this Court does have jurisdiction to resolve. Plaintiffs assert that federal law precludes a state which has elected to reflect post-1969 inflation in its standard of needs from rescinding that election unless it can show that the resulting standard is consistent with the federal definition of standard of need, namely "the amount deemed necessary to provide for essential needs such as food, clothing, and shelter." *See* Plaintiffs' Answering Brief at 25, quoting from *Quern v. Mandley,* 436 U.S. 725, 737, 98 S.Ct. 2068, 2075, 56 L.Ed.2d 658 (1978). Since Delaware elected to include post-1969 inflation when Section 509 was adopted, plaintiffs urge, the General Assembly was without authority to effectively rescind that election in S.B. 209 absent a showing that the amounts there set forth are sufficient to provide for essential needs.

■ The first flaw in plaintiffs' argument is that the federal definition of standard of need clearly does not include post-1969 inflation. The Court of Appeals for the Third Circuit so held in *New Jersey Welfare Rights Organization v. Cahill,* supra. While plaintiffs acknowledge this holding at one point in their brief, they nevertheless insist that Delaware has violated the "federal definition" if it is unable to demonstrate that the amounts in S.B. 209 include enough to cover post-1969 inflation. Since the federal concept of standard of need does not include post-1969 inflation and the amounts stated in S.B. 209 concededly exceed Delaware's 1969 standard of

increased by a percentage and that percentage can readily be applied to the various levels of standards of need under the AFDC, old age assistance, aid to the blind and aid to the disabled programs. The only difficulty in application arises from the references in the second sentence of Section 509 to "dollar amount" and "dollar adjustment." If one reads the references to call for a fixed dollar amount adjustment, the statute cannot be applied because these pro-

grams have a variety of standards of need depending on the personal situation of the recipient of the aid (e.g. the size of his or her family, etc.). Given this impossibility and the clear intention that there be a comparable increase in Delaware's standards of need whenever there is a percentage increase in the Title II index, I do not read these references in such a restricted way.

need, plaintiffs cannot prevail unless federal law provides that a state electing to take post-1969 inflation into account cannot rescind that election.

According to plaintiffs, *Rosado v. Wyman, supra,* held that the "standard of need" established by a state cannot be reduced because Section 402(a)(23) of the Social Security Act mandates honesty on the part of the administrators of AFDC programs by requiring them to inform the public the extent to which the state is falling short of meeting the subsistence needs of its citizens by setting a standard of need which accurately reflects the costs of those needs in 1969.[15] Section 402(a)(23) provides in relevant part:

[The States shall] provide that by July 1, 1969, the amounts used by the States to determine the needs of individuals will have been adjusted to reflect fully changes in living costs since such amounts were established, and any maximums that the State imposes on the amount of aid paid to families will have been proportionately adjusted.

42 U.S.C. § 602(a)(23).

*Rosado* noted that one of the purposes of a standard of need was to promote such honesty. It also pointed out that the Act does not define what needs are to be considered by a state in establishing its standard of need. The precise holding of the Court was as follows:

Section 420(a)(2) invalidates any state program that substantially alters the standard of need in such a way that it is less than it was prior to the enactment of § 402(a)(23), unless a State can demonstrate that the items formerly included no longer constitute part of the reality of existence for the majority of welfare recipients.... Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently

with § 402(a)(23) redefine its method for determining need.

397 U.S. at 419, 90 S.Ct. at 1221.

A number of courts have construed *Rosado* to require that whenever a state modifies its standard of need, it must establish not only that the change has not watered down the state's pre-1969 standard of need, but also that it has not reduced the standard which existed immediately prior to the change.[16] The issue raised by this case is whether this is a fair reading of *Rosado.* It can be argued that the *Rosado* holding was required to effectuate the Congressional mandate that there be a one time cost of living update in standards of need in 1969 and that only a comparison between the pre-1969 standard and the new standard is required. Alternatively, it can be argued that any comparison between the standard immediately before and immediately after should be limited to determining whether items included in the former have been omitted from the latter. Under either of these approaches, there is concededly no infirmity in the standards of need established by S.B. 209.

On the other hand, it can be argued, as plaintiffs do, that once a state officially acknowledges the existence of post-1969 inflation, the federal policy favoring "honesty" requires that it continue to acknowledge it unless it can establish that inflation is no longer increasing the amount required to subsist. This argument has appeal obviously because standards of need which reflect post-1969 inflation offer more realistic standards by which to judge the adequacy or inadequacy of payment levels. The difficulty with this argument, however, is that while Congress decreed honesty, it did not decree complete honesty. While it may have intended that states must be honest to the extent that they should not dilute their standard of need by eliminating constituent elements, it clearly did not intend that they must be honest about post-1969 inflation.

---

**15.** *See* the quote from *Rosado, supra* at 231.

**16.** *See, e.g., Roselli v. Affleck,* 508 F.2d 1277 (1st Cir.1974); *Illinois Welfare Rights Org'n. v. Trainor,* 438 F.Supp. 269 (N.D.Ill.1977).

■ While I acknowledge that there is authority which would suggest a contrary conclusion,[17] I perceive nothing in *Rosado* or in the federal statute which would bar Delaware's General Assembly from rescinding the decision reflected in Section 509 and setting its own standards of need at the levels established by S.B. 209.

Accordingly, the defendants are entitled to summary judgment on that portion of plaintiffs' claim relating to the period after January 1, 1984. I will confer with counsel to fashion a remedy for defendants' violations of the OBRA in the period from 1981 through 1983.