772 F.2d 1114
 Karen EVERETT and Marion Mickens, individually and on behalf
of their children, and on behalf of all other
persons similarly situated
v.
Patricia SCHRAMM, in her official capacity as Secretary of
the Delaware Department of Health and Social Services; and
Charles Hayward in his official capacity as Director of the
Department's Division of Economic Services, Appellants in
No. 84-5490.
Appeal of Marion MICKENS and Karen Everett on behalf of
themselves and all other persons similarly
situated, Appellants in No. 84-5449.
 Nos. 84-5449, 84-5490.
 United States Court of Appeals,
Third Circuit.
 Argued April 29, 1985.
Decided Sept. 6, 1985.
 
 Joshua M. Spielberg (argued), Tomar, Parks, Seliger, Simonoff & Adourian, Haddonfield, N.J., for appellants.
 Matthew J. Lynch, Jr., Marcia Rees (argued), Dept. of Justice, State of Del., Wilmington, Del., for appellees.
 Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and NEWCOMER, District Judge*.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 Karen Everett and Marion Mickens ("plaintiffs") brought this class action alleging illegalities in the administration of the State of Delaware's Aid to Families With Dependent Children ("AFDC") program. Defendants Patricia Schramm and Charles Hayward were sued in their official capacities as, respectively, Secretary of the Delaware Department of Health and Social Services ("the Department") and Director of the Department's Division of Economic Services. The district court, 587 F.Supp. 228 (D.C.Del.1984), found for the plaintiffs and granted declaratory and injunctive relief with respect to certain AFDC calculations made between October 1, 1981 and December 31, 1983. With respect to calculations since January 1, 1984, the district court found for defendants. Plaintiffs appealed and defendants cross-appealed. For the reasons that follow, we will affirm.
 
 I.
 
 2
 AFDC was one of four categorical assistance programs created by the Social Security Act of 1935, Sec. 401 et seq., 49 Stat. 620, 627 (1936). Though AFDC has frequently been amended over the years, the program's basic structure--an early example of cooperative federalism--has remained constant. Under the program, financially needy households that include dependent children receive monetary payments from the state. The payments are funded jointly by the state and federal governments. To be eligible for federal matching funds, a state must adopt a plan for aid and services to needy families in conformity with 42 U.S.C. Sec. 602.
 
 
 3
 States must set two standards for the program: the standard of need and the payment level. The standard of need is a set of amounts each state considers adequate to provide for the subsistence needs of households of various sizes. It is "a dollar figure set by each State reflecting the amount deemed necessary to provide for essential needs, such as food, clothing, and shelter." See Quern v. Mandley, 436 U.S. 725, 737, 98 S.Ct. 2068, 2075, 56 L.Ed.2d 658 (1978). While a 1968 amendment to the federal law required that the standard of need be adjusted by July 1, 1969 to reflect increases in the cost of living, 42 U.S.C. Sec. 602(a)(23), Alvarado v. Schmidt, 317 F.Supp. 1027, 1038-39 (W.D.Wis.1970), it does not mandate any adjustment to account for inflation that has occurred thereafter, New Jersey Welfare Rights Organization v. Cahill, 483 F.2d 723, 726 (3d Cir.1973), nor does it specify which household expenses must be included in the calculation. Metcalf v. Trainor, 472 F.Supp. 576, 586 (N.D.Ill.1979). The payment levels, in contrast, are the amounts the state actually pays to eligible households. The amounts paid vary with the number of household members and the amount of the household's other income. "Congress has always left to the States a great deal of discretion" as to both the standard of need and the level of benefits to be paid. Rosado v. Wyman, 397 U.S. 397, 408, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970). And, until quite recently, AFDC mandated no particular relationship between the two figures; states were free to pay any level of benefits without regard to the standard of need. Johnson v. Likins, 568 F.2d 79, 82 (8th Cir.1977).
 
 
 4
 The standard of need took on greater significance with the enactment of the Omnibus Budget Reconciliation Act of 1981 ("OBRA"), Pub.L. No. 97-35, Secs. 2302, 2306, 95 Stat. 357, 845-46 (1982), which became effective October 1, 1981. First, OBRA declared any household whose gross income exceeded 150 percent of the state's standard of need ineligible for AFDC benefits. 42 U.S.C. Sec. 602(a)(18). Second, OBRA required the states to assume that stepparents contribute a certain part of their income to the household for the purpose of calculating the amount of household income to be subtracted from the payment level. 42 U.S.C. Sec. 602(a)(31). The amount assumed to be contributed by the stepparent is calculated by subtracting from the stepparent's income a sum that includes an amount equal to the state's standard of need for a household consisting of the stepparent and his or her actual dependents.
 
 
 5
 The effects of the statutory changes wrought by OBRA are well-illustrated in the cases of the named plaintiffs. In January 1983, Karen Everett was receiving AFDC payments of $197 per month for herself and her infant child. At that time she took a part-time job with an expected average gross monthly income of $400. Shortly thereafter, she was notified that her AFDC payments would be terminated because her income exceeded 150 percent of what Delaware contends was its standard of need for a family of two.[1] In February 1983, when Marion Mickens married Charles Mickens, she was receiving an AFDC grant of $266 per month for herself and her two children. Mr. Mickens had a gross income at that time of approximately $400 per month. Calculations required by Sec. 602(a)(31) were done to determine how much of this stepparent's income would be assumed to be available to Mrs. Mickens and her children. The amount of Mr. Mickens' income disregarded was equal to what Delaware contended was its standard of need for a family of two--$197.[2] Enough was left and assumed to be available to Mrs. Mickens and her children that her benefits were terminated.
 
 
 6
 On April 15, 1983, Everett and Mickens filed this lawsuit seeking declaratory and injunctive relief on behalf of a class consisting of all Delaware AFDC recipients and applicants who were or would be denied benefits due to the state's application of OBRA's "150 percent" and "stepparent income" rules. They argued that Delaware had violated federal and state law by using its then-current AFDC payment level, rather than its actual (and allegedly much higher) standard of need, in making the calculations required under OBRA. There was no dispute that Delaware complied with the terms of 42 U.S.C. Sec. 602(a)(23) by conducting a cost of living study in 1968 and establishing standard of need in accordance with the results.[3] Plaintiffs' principal contention was that under Del.Code Ann. tit. 31, Sec. 509 (1974), as enacted in 1971,[4] Delaware's 1968 standard of need had subsequently been subject to annual adjustments for increases in the Consumer Price Index.[5] Defendants, however, contended that the only statutory provisions defining its standard of need were Del.Code Ann. tit. 31, Sec. 502(8)[6] and Sec. 503(d)[7], that authority for establishing the standard of need in accordance with the statutory definition was vested in the Department, and that the actual standard of need so established--which had been increased several times since 1968, but had not kept pace with inflation--appeared under the heading "Standard Allowance Schedule: Basic Personal Needs" in Delaware's AFDC plans submitted to the federal government.[8] These figures, Delaware contended, had properly been used in making the OBRA "150 percent" and "stepparent income" calculations during the period October 1, 1981-December 31, 1983.
 
 
 7
 The district court granted summary judgment to plaintiffs on this issue. On June 8, 1984, the district court ordered that:
 
 
 8
 Any claims against members of the plaintiff class by the Department of Health and Social Services (DHSS), which were asserted before the date of this Order, for AFDC overpayments involving the application of 42 U.S.C. Secs. 602(a)(18) and 602(a)(31) between October 1, 1981 and December 31, 1983, shall be recalculated utilizing the standards of need in this Order.[9] In addition, all new overpayment claims initiated after the date of this Order shall be calculated using the standards of need in this Order.[10]
 
 
 9
 While this case was pending in district court, the Delaware assembly approved a bill ("S.B. 209") that repealed the cost of living adjustment provision in Sec. 509 and amended Sec. 503(d) to read, in relevant part:
 
 
 10
 The standard of need for aid to families with dependent children on and after January 1, 1984, shall be as follows, based on family size: One person household--$152 per month; 2 person household--$212 per month; 3 person household--$287 per month; 4 person household--$336 per month; 5 person household--$416 per month; 6 person household--$475 per month; 7 person household--$534 per month; and $54 dollars per month for each additional person, beyond 7, in the household who qualifies for assistance.
 
 
 11
 Del.Code Ann. tit. 31, Sec. 503(d) (Supp.1984).
 
 
 12
 Plaintiffs then claimed that S.B. 209 effected an impermissible reduction in the standard of need.[11] Though they conceded that AFDC imposes no obligation on the states to account for post-1969 inflation in calculating their standard of need, they contended that once a state had recognized inflation as an element of its standard of need, it must consistently do so. The district court rejected this contention, and entered summary judgment for the defendants as to the S.B. 209 standard of need. In their appeal, plaintiffs contend that the district court erred in upholding the S.B. 209 standard of need. By cross-appeal, defendants contend that under the eleventh amendment and Pennhurst State School & Hospital v. Halderman (Pennhurst II), 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the district court was without jurisdiction to enforce the former Sec. 509 cost of living adjustment, as this amounted to compelling state officials to comply with state law.[12] We shall first address the Pennhurst II issue, and then the S.B. 209 standard of need issue.
 
 II.
 The eleventh amendment provides:
 
 13
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.
 
 
 14
 It is well-settled as a matter of judicial construction that despite its limited and seemingly unambiguous language, the eleventh amendment constitutionalizes a much more far-reaching principle of state sovereign immunity. See generally Shapiro, Wrong Turns: The Eleventh Amendment and the Pennhurst Case, 98 Harv.L.Rev. 61 (1984); Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum.L.Rev. 1889 (1983). Thus, in Hans v. Louisiana, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), the Supreme Court held that the eleventh amendment prohibits a federal court from hearing a suit brought against a state by its own citizens, absent the state's consent. Where a state agency or department is named as defendant, that too is considered a suit against the state which is barred by the eleventh amendment. See Florida Department of Health and Rehabilitative Services v. Florida Nursing Home Association, 450 U.S. 147, 101 S.Ct. 1032, 67 L.Ed.2d 132 (1981). Where officials are named as defendants, "[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." Hawaii v. Gordon, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963). This rule, however, is subject to an exception of vast import: where a suit seeks prospective injunctive relief against a state official for action contrary "to the supreme authority of the United States", it is not deemed a suit against the sovereign. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). This so-called "stripping doctrine" has been limited to suits for prospective injunctive relief; the federal courts have no jurisdiction to award retroactive monetary relief in such cases. Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[13]
 
 
 15
 In Pennhurst II the Supreme Court confronted another variation on the Ex parte Young theme, a pendent claim against state agencies and officers seeking prospective injunctive relief for a violation of state law. The Court held that such suits were barred by the eleventh amendment:
 
 
 16
 In such a case the entire basis for the doctrine of Young and Edelman disappears. A federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law. On the contrary, it is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.
 
 
 17
 465 U.S. at ----, 104 S.Ct. at 911.
 
 
 18
 Defendants argue that under Pennhurst II the district court lacked jurisdiction to award prospective relief on the basis of a violation of a state statute, former Del.Code Ann. tit. 31, Sec. 509 (1974). We need not decide whether that is a correct statement of law, because it is plain to us that it is a mischaracterization of the case before us. Plaintiffs brought suit under 42 U.S.C. Sec. 1983--which creates a cause of action for certain violations of federal law by state action--claiming that defendants violated the Social Security Act by failing to use its actual standard of need in calculations required under the OBRA amendments.[14] Federal jurisdiction over this claim was based on the existence of a federal question, not, as in Pennhurst II, on principles of pendent jurisdiction. Though it is true that this required the district court to ascertain what the standard of need was under Delaware law, ascertaining state law is a far cry from compelling state officials to comply with it. The ascertainment of state law is an everyday function of the federal court, in cases ranging from those falling within our diversity or pendent jurisdiction, to those brought under Sec. 1983 which claim deprivation of a state-created property right. Indeed, Sec. 1983 would be rendered almost nugatory if federal courts are prohibited, by the eleventh amendment, from deciding matters of state law in cases brought against state officials. Nor are we troubled by the fact that in this case compelling compliance with federal law may incidentally require compliance with state law. Where, as here, federal law incorporates by reference requirements established by state law, the federal supremacy rationale underlying Ex parte Young applies with equal force. See Students of California School for the Blind v. Honig, 736 F.2d 538 (9th Cir.1984), vacated on other grounds, --- U.S. ----, 105 S.Ct. 1820, 85 L.Ed.2d 114 (1985). To hold otherwise would seriously undermine the national government's role in programs based on cooperative federalism. "To put the matter more bluntly, where a state violates federal law, it is no better off because it also violates its own law." Louise B. v. Coluatti, 606 F.2d 392, 399 (3d Cir.1979).
 
 III.
 
 19
 Plaintiffs present three somewhat related arguments in support of their contention that Delaware violated federal law in enacting S.B. 209, which dramatically decreased its standard of need.[15] First, plaintiffs argue that the "federal definition" of the standard of need as a "reasoned assessment" of the cost of providing for essential needs prohibits "arbitrary" reductions. Second, they argue that federal law incorporates a policy of "honesty" that requires that once a state has imposed upon itself an increase in the standard of need beyond 1969 levels, it cannot later reduce its standards of need in a way that "obscures" the previously determined amount necessary to provide for essential needs. Finally, they argue that by setting the standard of need equal to its payment level, Delaware thwarted the clear purpose of OBRA. In evaluating these arguments, it is important to keep in mind one matter that is not in dispute: that Delaware complied with the Sec. 602(a)(23) mandate that its standard of need be updated to reflect increases in the cost of living by July 1, 1969, and that at all times the standard has remained at or above that level.
 
 
 20
 Standard of Need As A "Reasoned Assessment".
 
 
 21
 Plaintiffs argue that the essential characteristic differentiating a state's AFDC payment levels from its standard of need is that, while payment levels may be arbitrarily set, the standard of need must be a "reasoned assessment" of the cost of meeting basic needs. Thus, they argue, an "arbitrary" change--that is, one not supported by any evidence of an actual reduction in the cost of meeting basic needs--is prohibited by federal law.
 
 
 22
 Even assuming for present purposes that the reduction was arbitrary,[16] we believe that federal law requires only that there be no reductions to levels below the July 1, 1969 standard of need. Some hypotheticals expose the fallacy in plaintiffs' position. They concede that Delaware could, consistently with federal law, have kept its standard of need at the July 1, 1969 level, yet it is difficult to see how this would be significantly less arbitrary--in the light of inflation--than raising the standard of need and later bringing it back down to the original level. (The July 1, 1969 cutoff date is, in itself, an arbitrary element built right into the definition of the standard of need.) Moreover, we do not believe that plaintiffs would argue that had Delaware maintained its 1969 standard of need until the passage of S.B. 209, that it violated federal law by arbitrarily increasing its standard of need in a manner not proportional to inflation, yet that would seem to be a necessary implication of the argument they urge before us now. We conclude that the reduction in the standard of need effected by S.B. 209 did not violate the "federal definition" of the standard of need, even if it is not supported by any corresponding actual reduction in the cost of meeting basic needs.
 
 
 23
 The Policy of "Honesty".
 
 
 24
 In Rosado v. Wyman, supra, the Supreme Court noted that 42 U.S.C. Sec. 602(a)(23) was "a child born of the silent union of legislative compromise." 397 U.S. at 412, 90 S.Ct. at 1218. Though Congress rejected a proposal that would have required an annual adjustment of the standard of need, "it embodied in legislation the cost-of-living exercise which has both practical and political consequences." 397 U.S. at 413, 90 S.Ct. at 1218. The Court described the political aspect of the one-time adjustment as follows:
 
 
 25
 [W]hile it leaves the States free to effect downward adjustments in the level of benefits paid, it accomplishes within that framework the goal, however modest, of forcing a State to accept the political consequence of such a cutback and bringing to light the true extent to which actual assistance falls short of the minimum acceptable.
 
 
 26
 Id. Under plaintiffs' interpretation of this passage, Sec. 602(a)(23) incorporates a federal policy requiring "honesty" in making adjustments to the standard of need. See Illinois Welfare Rights Organization v. Trainor, 438 F.Supp. 269, 272 (N.D.Ill.1977). Thus, they contend, once a state has imposed upon itself a cost of living increase in its standard of need beyond 1969 levels, it cannot later reduce its standard of need in such a way as to "obscure"[17] the previously recognized standard.
 
 
 27
 The holding in Rosado, as plaintiffs must concede, is far more limited than the rule they ask us to adopt here. In that case New York, which had previously computed its standard of need on an individualized basis, moved to a system, like Delaware's, of fixed allowances based on the number of individuals per household. 397 U.S. at 416, 90 S.Ct. at 1219. In so doing, it made no attempt to average certain expenses--such as telephone and laundry--that had been included in the individualized need determinations. This, the Court held, was impermissible:
 
 
 28
 [Section 602(a)(23) ] invalidates any state program that substantially alters the content of the standard of need in such a way that it is less than it was prior to the enactment of [Sec. 602(a)(23) ], unless a State can demonstrate that the items formerly included no longer constituted part of the reality of existence for the majority of welfare recipients. We do not, of course, hold that New York may not, consistently with the federal statutes, consolidate items on the basis of statistical averages.... Providing all factors in the old equation are accounted for and fairly priced and providing the consolidation on a statistical basis reflects a fair averaging, a State may, of course, consistently with [Sec. 602(a)(23) ] redefine its method for determining need.
 
 
 29
 397 U.S. at 419, 90 S.Ct. at 1221. Plaintiffs cannot bring this case directly within the scope of Rosado by characterizing "inflation" as a factor which Delaware included in its standard of need prior to S.B. 209, and which under Rosado could not be eliminated unless Delaware could demonstrate that it "no longer constituted part of the reality of existence for the majority of welfare recipients." In New Jersey Welfare Rights Organization v. Cahill, supra, this court specifically rejected the contention that inflation could be "a 'factor' of need as that term was used in Rosado." 483 F.2d at 726.[18] In addition, Rosado dealt with factors that were included in the standard of need prior to enactment of Sec. 602(a)(23) in 1968; Delaware did not adopt an inflation adjustment until 1971. Plaintiffs do argue that the federal policy of "honesty", as reflected in the Rosado holding that the content of the standard of need cannot be reduced, also prevents a state from reducing the inflation-adjusted levels of the standard of need absent a demonstration that previously recognized inflation is no longer a reality of existence.
 
 
 30
 We, however, doubt that the policy behind Sec. 602(a)(23) can be to require "honesty" as plaintiffs define it. We do not see how reducing inflation-adjusted levels is any less "honest" than maintaining 1969 levels during a period of high inflation, a course of action which the parties agree would be permissible under Sec. 602(a)(23). If "honesty" about changes in the cost of living is what Congress intended to require, it is difficult to imagine why it mandated only one inflation adjustment. We believe that the policy behind Sec. 602(a)(23), as explicated by Justice Harlan in Rosado, is more aptly described as requiring "political accountability" for dishonesty than as requiring honesty. The basic function of the standard of need is as a "yardstick" for evaluating the adequacy of a state's AFDC program. 397 U.S. at 408, 90 S.Ct. at 1216. By requiring a one-time cost of living adjustment by July 1, 1969, Congress ensured that there would be a standard of measurement--a base period--allowing for simple and meaningful comparisons in the political arena. It is "a benchmark against which subsequent changes in state welfare programs may be evaluated." Roselli v. Affleck, 508 F.2d 1277, 1279 (1st Cir.1974). "A state may choose to lower the level of benefits actually paid to welfare clients but it may not lower or obscure its standard of need in such a way as to disguise the step and avoid public scrutiny." Id. So long as the factors entering into the calculation are not altered, it is inconsequential for the purposes of Sec. 602(a)(23) whether the state raises the actual dollar amounts it officially deems necessary to cover these expenses, because any "dishonesty" in setting these figures will be exposed to public scrutiny.[19] If, on the other hand, a state could eliminate items of expense that were included in the 1969 equation, comparisons over time would be rendered less meaningful and politically potent--much as if items included in the Consumer Price Index "market basket" during its base year of 1967 were suddenly disregarded in 1985.
 
 
 31
 We do not believe that Delaware's action contravenes the policy of political accountability. The failure of Delaware's current standard of need (and its payment levels) to reflect inflation that has occurred since 1968 is there for the public to see, as is the dramatic and seemingly unjustified reduction that took place between 1983 and 1984. Under the statutory scheme, AFDC recipients and activists must avail themselves of the political process, not the judicial process, to use these figures to effect the changes they seek. Though some may question the wisdom or efficacy of relegating such persons and interests to the political process, see generally J. Ely, Democracy and Distrust (1980), Congress clearly could determine that the extent of the statutory right to AFDC benefits be subject to the ebb and flow of state political power.[20]The Purpose of OBRA.
 
 
 32
 Finally, plaintiffs argue that because the plain language of OBRA requires that the state's standard of need, rather than its payment levels, be used in the "150 percent" and "stepparent income" calculations, Delaware thwarted the clear purpose of OBRA by setting its standard of need equal to its payment levels. This argument need not detain us. Nowhere does AFDC--before or after OBRA--prohibit a state from setting its standard of need equal to its payment levels; indeed, that would seem to be the theoretically optimal situation. Again, some simple hypotheticals illustrate the flaw in plaintiffs' argument. Under their reading of OBRA, a state would not thwart its purpose provided that it set its standard of need just one penny above or one penny below its payment levels, but that it does violate OBRA when it makes them exactly equal. We think it is clear that, given the complete discretion left to the states in setting the payment levels, by using instead the standard of need in OBRA calculations, Congress required only that the figures used at least reflect a state's 1969 cost of fulfilling essential needs. It is conceded that the figures used by Delaware meet this criterion, and therefore we find no violation of OBRA.
 
 
 33
 When an object designed to perform one relatively passive function is pressed into serving an entirely different and quite active function, unintended and perhaps even anomolous results can be expected. This, it appears, is what happened when the standard of need--originally just a "benchmark"--suddenly became central to AFDC eligibility determinations. Though we may agree that there is a certain illogic in permitting the legislative action that we uphold today, it is for Congress to determine whether the statutory scheme that permits it is in need of repair.
 
 CONCLUSION
 
 34
 For the foregoing reasons, the judgment of the district court will be affirmed.
 
 
 
 *
 Honorable Clarence C. Newcomer, United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 Delaware used the following "standard of need" figures in making calculations under OBRA during the period October 1, 1981-December 31, 1983:
 Household Size
 1 $141
 2 197
 3 266
 4 312
 5 386
 6 440
 7 495
per each additional person 54
 
 
 [2]
 See footnote 1 supra
 
 
 [3]
 The 1968 study established the following standard of need:
 Household size
 1 $107
 2 149
 3 201
 4 236
 5 292
 6 333
 7 374
per each additional person 41
 
 
 [4]
 Prior to January 1, 1984, this section provided in relevant part:
 The standard of need for old-age assistance, aid and services to needy families with children, aid to the blind or aid to the permanently and totally disabled shall be adjusted upward simultaneously with any percentage increase in old-age, survivors and disability insurance as provided by Title II of the Social Security Act, as amended [42 U.S.C.A. Sec. 402 et seq.]. The dollar amount of increased adjustment of this standard of need shall be the same as the dollar adjustment of the increase in old-age survivors and disability insurance.
 
 
 [5]
 As found by the district court, the adjusted figures for the relevant period were:
 Household Size 1981 1982 1983
 1 $258 277 287
 2 359 386 399
 3 484 521 539
 4 569 611 632
 5 704 756 783
 6 803 862 892
 7 901 969 1002
per each additional person 99 106 110
 
 
 [6]
 " 'Standard of need' means the subsistence level for a decent and healthful standard of living as set under Sec. 503 of this chapter."
 
 
 [7]
 Prior to January 1, 1984, this subsection provided in relevant part:
 The amount of assistance or supplementary services granted as aid to families with dependent children shall be determined by the Department with due regard to the resources and necessary expenditures of the family and the conditions existing in each case and in accordance with the rules and regulations made by the Department and shall be sufficient, when added to all other income and support available to the family, to provide such family with a reasonable subsistence compatible with decency and health.
 
 
 [8]
 The figures in the AFDC plans were as follows:
 Household Size 1968-71 1972-78 1979-83
 1 $107 130 141
 2 149 181 197
 3 201 245 266
 4 236 287 312
 5 292 355 386
 6 333 405 440
 7 374 455 495
per each additional person 41 50 54
 
 
 [9]
 See footnote 5 supra
 
 
 [10]
 Apparently, the relief was limited to the recalculations of overpayment claims in order to comply with the eleventh amendment's proscription against retroactive monetary relief. See Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)
 
 
 [11]
 Compare footnote 15 infra
 
 
 [12]
 It would appear that the state has abandoned its contentions, raised before the district court and rejected there, that former Sec. 509 simply did not apply to AFDC, and that it was implicitly repealed in 1974. At oral argument--though not in the briefs--counsel for Delaware did again allude to the state's contention that the AFDC plans submitted to the federal government are dispositive regarding the standard of need. This is not necessarily so, see, e.g., Coleman v. O'Bannon, 550 F.Supp. 195 (E.D.Pa.) (rejecting definition contained in the plan in light of extrinsic documents using different definition), aff'd, 692 F.2d 748 (3d Cir.1982), and is certainly not true where, as here, the plans that were prepared by a state welfare agency, and which do not use the term "standard of need", conflict with the clear mandate of a statute duly enacted by the legislature. See also Roselli v. Noel, 414 F.Supp. 417, 425 (D.R.I.1976) (actual practice can be relied upon to give content to an ambiguous standard of need, but cannot itself establish a standard which totally disregards a legislative decision to increase the content of its standard)
 
 
 [13]
 Cf. footnote 10 supra
 
 
 [14]
 Plaintiffs did state, in their complaint, a pendent cause of action under Del.Code Ann. tit. 31, Sec. 512(3), which requires periodic surveys of costs of living for Delaware welfare recipients. The district court held that this claim was barred by the eleventh amendment. Everett v. Schramm, 587 F.Supp. 228, 235 (D.Del.1984)
 
 
 [15]
 The following chart compares the pre- and post-S.B. 209 standards of need:
 Household Size 1983 S.B. 209
 1 $287 152
 2 399 212
 3 539 287
 4 632 336
 5 783 416
 6 892 475
 7 1002 534
per each additional person 110 54
 
 
 [16]
 Plaintiffs go further and argue that the reduction in the standard of need was not only arbitrary, it was in fact unintended by the legislature. They rely principally on an affidavit by the sponsor of S.B. 209 to the effect that his only purpose in introducing the bill was to raise payment levels 8%, and that he had relied on the expertise of the Department to draft a bill that would have only that effect. We need not decide what significance an inadvertent reduction would have, as we cannot conclude on the basis of such meager evidence that the legislature did not intend the immediate effect that its law, by its explicit terms, quite clearly accomplished
 Plaintiffs do not now contend that Delaware's action was unconstitutional.
 
 
 [17]
 This term is also derived from Rosado: "[A] State may, after recomputing its standard of need, pare down payments to accommodate budgetary realities by reducing the percent of benefits paid or switching to a percent reduction system, but it may not obscure the actual standard of need." 397 U.S. at 413, 90 S.Ct. at 1218 (emphasis in original)
 
 
 [18]
 Cahill involved a freeze, rather than a rollback, of inflation-adjusted need levels. Thus, it does not directly foreclose the "no reduction" argument plaintiffs urge now
 
 
 [19]
 Indeed, even the Illinois Welfare Rights Organization case, on which plaintiffs rely, seems to understand the policy of Sec. 602(a)(23) to be principally one of accountability:
 In effect, what [Sec. 602(a)(23) ] mandated was 'honesty' on the part of the administrators of state AFDC programs requiring them to inform the public to what extent the state was failing to meet the subsistence needs of its citizens in relation to the standard of need established by the state itself.
 
 
 [438]
 F.Supp. at 272-73
 
 
 [20]
 Plaintiffs rely on Roselli v. Affleck, 508 F.2d 1277 (1st Cir.1974) and Illinois Welfare Rights Organization v. Trainor, 438 F.Supp. 269 (N.D.Ill.1977) for the proposition that a state that has recognized post-1969 inflation by raising its standard of need cannot thereafter reduce its standard of need in such a way that it "obscures" the previously determined amount necessary to provide for essential needs. We need not decide whether this court should approve the rule of these cases, because we find that they are distinguishable in two significant respects. First, in each case the state used individualized determinations of "actual need" for certain items as of July 1, 1969, and thus arguably had an obligation under Rosado to average actual need figures at the later date when they moved to a system of standardized need determinations. Cf. Roselli v. Noel, 414 F.Supp. 417, 425 (D.R.I.1976) (once this is done correctly, there is no further federal obligation to account for inflation). Second, because in both of these cases, and in Rosado as well, the challenged changes in the standard of need were part of a shift from individualized to standardized systems, the potential for actually "obscuring" the previous standard of need is much greater than where--as here--there is simply a straightforward reduction in determinable dollar amounts