[Civ. No. 13611. Third Dist. Dec. 28, 1973.]

JESSIE McDONALD et al., Plaintiffs and Appellants, v. STOCKTON METROPOLITAN TRANSIT DISTRICT et al., Defendants and Respondents.

## COUNSEL

Gene Livingston and Richard Oliver for Plaintiffs and Appellants.

John A. Wilson for Defendants and Respondents.

Richard G. Kliendienst, Attorney General (United States), Harlington Wood, Jr., Assistant Attorney General, Robert E. Kopp, Edwin E. Huddleson III, George W. Haley, Joseph A. Blundon and Cary B. Lerman as Amici Curiae.

## OPINION

**FRIEDMAN, Acting P. J.**—Two individuals sue on behalf of themselves and other users of bus service supplied by the Stockton Metropolitan

Transit District. The trial court rejected their petition for a writ of mandate to compel the transit district to install 20 bus stop shelters as projected by a federally financed program.

In addition to the parties' appeal briefs, the court has received an amicus curiae brief filed by counsel representing the United States Secretary of Transportation. The briefs debate a number of issues—petitioners' standing to sue, availability of mandamus to control an exercise of official discretion, availability of mandamus to enforce a public contractual duty, and, finally, whether a contractual duty actually exists.

 After reviewing the federal statutes and the transactions between the federal and local agencies, we have concluded that relief by mandamus should be denied and the judgment of the trial court affirmed. The judgment will bring the lawsuit to an end without resolving the dispute it embodies. While our decision might rest on any of several grounds, we have adopted an approach whose delineation may possibly assist in a solution or at least clarify the relative positions.

The Urban Mass Transportation Act of 1964 (49 U.S.C. § 1601 et seq.) authorizes a program of federal financial assistance to local transportation agencies. In 1966 the Urban Transportation Administration (which later became an agency within the federal Department of Transportation) approved a grant covering two-thirds of the cost of a project of the Stockton Metropolitan Transit District, consisting of the purchase of 20 new buses, the modernization of maintenance and office facilities and construction of bus stop signs and 20 bus stop shelters. Total cost of the project was ultimately fixed at $617,280. The 20 bus stop shelters plus 350 bus stop signs were budgeted at $25,500.

After five years all phases of the contract had been completed except construction of the shelters. There had been some federal-local disagreement over the shelters' design. In May 1971 the district directors adopted a resolution "withdrawing" their proposal to erect the shelters. The district requested the Urban Mass Transportation Administration to permit it to construct a bus painting booth with the money originally budgeted for the 20 shelters. The district cited neighboring property owners' opposition to construction of the shelters and economies to be achieved by the district's repainting its buses through the use of the proposed painting booth. There followed an exchange of communications between the Urban Mass Transportation Administration and the transit district, the former rejecting the proposed alteration of the project, the latter repeating and elaborating its request.[1] Meanwhile, petitioners and other bus riders were

---

[1] A letter of the federal agency dated July 21, 1971, stated: "Since a paint shop is not part of the project, we could not permit project funds to be used for this purpose.

demanding construction of the shelters. This lawsuit was filed in November 1971. There has been no apparent change in the status quo since 1971.

The Urban Mass Transportation Act authorizes the federal agency to prescribe the "terms and conditions" of the grants and to commence any action to enforce contracts and secure compliance with the terms of grants. (See 49 U.S.C. §§ 1602(a), 1608(a), 1608(e); 12 U.S.C. § 1749a(c)(4).) The contract between the federal administrator and the Stockton Metropolitan Transit District was signed in November 1966. Section 2 recites that the transit district "agrees to undertake and complete the Project, and to provide for the use of Project facilities and equipment, substantially as described in its Application filed with and approved by the government and in accordance with the terms and conditions of this contract. The project consists of the purchase of approximately twenty (20) new buses, modernization of existing maintenance and office facilities, the purchase and installation of bus stop signs and shelters, and contingencies."

Section 102(a) of the contract states: "The Public Body [i.e., the transit district] shall commence, carry on, and complete the Project with all practicable dispatch . . . in accordance with the provisions hereof, the Application, and all applicable laws."

The contract calls for prior federal approval of any changes in the budget for the project.[2] Section 109 requires prior federal approval of individual purchase or construction contracts between the district and third persons. In section 105(b)(3) the federal government commits itself to honor fund requisitions and to pay eligible costs, provided (in effect) that the district has proceeded in conformity with its own obligations. The government reserves the power to suspend or terminate its obligations if the

---

. . . Since we cannot permit indefinite delays in carrying out project activities, I request that you submit a list of project items that have not been completed together with scheduled dates for the immediate completion of each item. If you cannot provide the above schedule and assurance that the remaining project activities will be completed in the near future, I propose to close the project without the items being completed."

[2]This demand is embodied in section 103 of the contract, which declares: "A Project budget shall be prepared and maintained by the Public Body. The Public Body shall carry out the Project and shall incur obligations against, and make disbursements of Project Funds only in conformity with the latest approved budget for the Project. The budget may be revised from time to time, but no budget or revision thereof shall be effective unless and until HUD [i.e., the Department of Transportation] shall have approved the same."

district discontinues the project or (in effect) alters it without prior federal approval.[3]

The writ of mandate may issue upon the petition of a "party beneficially interested" (Code Civ. Proc., § 1086) to compel the performance of "an act which the law specially enjoins, as a duty resulting from an office, trust or station. . . ." (Code Civ. Proc., § 1085.) ■ The exercise of jurisdiction in mandamus rests to a considerable extent in the wise discretion of the court. (*Wheelright* v. *County of Marin,* 2 Cal.3d 448, 457 [85 Cal. Rptr. 809, 467 P.2d 537].) In exercising this discretion the courts balance the applicant's need for relief (i.e., his beneficial interest) against the public need for enforcement of the official duty. ■ When the duty is sharp and the public need weighty, the courts will grant a mandamus at the behest of an applicant who shows no greater personal interest than that of a citizen who wants the law enforced. (*Bd. of Soc. Welfare* v. *County of L. A.,* 27 Cal.2d 98, 100-101 [162 P.2d 627]; *American Friends Service Committee* v. *Procunier,* 33 Cal.App.3d 252, 256 [109 Cal.Rptr. 22].) When the public need is less pointed, the courts hold the petitioner to a sharper showing of personal need. Decisions of the latter sort declare that the applicant's right to the writ must be "clear and certain." (*Irvine* v. *Gibson,* 19 Cal.2d 14, 15 [118 P.2d 812]; *McDaniel* v. *City etc. of San Francisco,* 259 Cal. App.2d 356, 360 [66 Cal.Rptr. 384].)[4]

---

[3]This reservation is expressed by section 106(a) of the contract, which recites: "If the Public Body abandons or, before completion, finally discontinues the Project; or if, by reason of any of the events or conditions set forth in paragraphs (1) to (5), inclusive, of Section 105(b) hereof, or for any other reason, the commencement, prosecution, or timely completion of the Project by the Public Body is rendered improbable, infeasible, impossible, or illegal, the Government may, by written notice to the Public Body, suspend any or all of its obligations under this Contract until such time as the event or condition resulting in such suspension has ceased or been corrected, or the Government may terminate any or all of its obligations under this Contract."

[4]Inquiry into the beneficial interest of a California mandamus applicant is one phase of the general problem of "standing." In opposition to petitioner's claim to judicial relief, the transit district has cited *Johnson* v. *Redevelopment Agency of City of Oakland, Cal.,* 317 F.2d 872, a decision of the United States Court of Appeals for the Ninth Circuit denying standing to residents of an urban redevelopment agency formed under California law who urged the agency's noncompliance with the conditions of a federal assistance grant. The *Johnson* decision has not been uniformly followed. (See *M. M. Crockin Co.* v. *Portsmouth Redevelopment H. Auth.,* 437 F.2d 784, 788; *Norwalk CORE* v. *Norwalk Redevelopment Agency,* 395 F.2d 920, 927.) In this state court proceeding between state residents and a public agency formed under state law, we apply the California criterion of beneficial interest without concern over petitioner's standing to maintain an equity action in a federal court. (See *City & County of San Francisco* v. *Western Air Lines, Inc.,* 204 Cal.App.2d 105, 120-126 [22 Cal.Rptr. 216].)

Initially, we sustain petitioners' contention that the transit district is under an existing duty to take all steps necessary to install the bus stop shelters. Statutory and contract provisions debar the local agency from unilateral selection among the segments of the federally assisted project. By statute, federal grants are available only in furtherance of projects meeting criteria established by the Secretary of Transportation "for a unified or officially coordinated urban transportation system as a part of the comprehensively planned development of the urban area. . . ." (49 U.S.C. § 1603(a).) Unilateral abandonment of one phase or another of an approved subject would frustrate the statutory purpose to achieve coordinated transit systems meeting federally established criteria.

■ The acceptance of a federal grant under terms and conditions authorized by Congress creates a binding contract. (*Burke* v. *Southern Pacific Railroad* (1914) 234 U.S. 669, 679 [58 L.Ed. 1527, 1544, 34 S.Ct. 907]; *McGehee* v. *Mathis* (1866) 71 U.S. (4 Wall.) 143, 155 [18 L.Ed. 314, 318]; *United States* v. *Frazer* (M.D.Ala. 1968) 297 F.Supp. 319, 323-324; *U. S.* v. *County School Bd. Prince George County, Va.* (E.D.Va. 1963) 221 F.Supp. 93, 99-100.) Here the "terms and conditions" are manifested by an express contract between the Urban Mass Transportation Administration and the Stockton Metropolitan Transit District. In sections 2 and 102(a) of the contract, the transit district specifically agreed to complete "the Project," whose various parts (including shelters) were enumerated. The district's inability to cancel out parts of the project without federal consent is emphasized by contract provisions permitting alteration of the project budget with federal consent (fn. 2, *supra*) and authorizing suspension or termination of federal payments upon abandonment or final cessation before completion (fn. 3, *supra*). As we interpret the contract, the budget alteration provision is the mechanism for achieving flexibility as the project moves along, provided that both the local and federal agencies agree upon changes. Once the project is approved and the contract signed, the local agency is bound to complete all its parts unless the federal agency permits alteration or elimination of one or several parts.

The transit district points out that the passenger shelters cannot be installed without permits from the City of Stockton. It is enough to say that the grant contract implicitly obligates the district to seek any local permits required by law. The record shows no unavailability of city permits; no showing that shelters cannot be designed and installed to elicit approval by both federal and municipal authorities; no showing of a deadlock between municipal and federal agencies.

The transit district's appeal brief asserts that it has commenced "pro-

ceedings" to amend the contract; that a proposed contractual amendment is "now" under federal consideration. The documents cited in support fail to provide support. Pursuant to its contract the transit district requested federal approval of its proposal to switch budgeted funds from the bus shelters to a painting booth. The federal agency's letter of July 21, 1971 (fn. 1, *supra*), can be construed only as an outright rejection of the proposal. Consequently, the transit district remains bound by its agreement to complete the project described in its 1966 contract, including the passenger shelters.

 Despite the transit district's subsisting contractual duty, petitioners' claim to judicial enforcement is beclouded by the rule that mandamus is not appropriate to enforce the contractual obligations of a public body. (*Wenzler* v. *Municipal Court,* 235 Cal.App.2d 128, 132-133 [45 Cal.Rptr. 54].) The rule is general and subject to qualifications. In an era when the welfare of citizens is increasingly affected by inter-governmental contracts and fiscal arrangements, a rule so stated is apt to suffer fissures. (See, e.g., *City of Culver City* v. *State Bd. of Equalization,* 29 Cal.App.3d 404, 409 [105 Cal.Rptr. 602].) It provides an untrustworthy standard here.

The prime factor in the denial of relief is that petitioners, as users of the bus service, are seeking judicial enforcement of a contract whose primary obligee, the federal Department of Transportation, has never charged the obligor with a breach. According to section 106a(a) of the grant contract (fn. 3, *supra*), the project's abandonment or final discontinuance permits the government to withhold further financial assistance. So far as the record goes, the last interagency development was the government's letter of July 21, 1971 (fn. 1, *supra*), rejecting the proposed elimination of shelters and giving the district a choice of scheduling completion of the project or closing it down. Presumably, the latter alternative involved no more than loss of funds covering the federal share of unperformed work.

The reservation of power to withhold funds does not bar the federal transportation agency from demanding the alternative of project completion. When a contract describes a remedy for breach without an express or implied limitation making that remedy exclusive, the injured party may seek any other remedy provided by law. (*Ryder Truck Rental, Inc.* v. *National Packing Company,* 380 F.2d 328, 332; *Nelson* v. *Spence,* 182 Cal. App.2d 493, 497 [6 Cal.Rptr. 312]; 5A Corbin on Contracts, § 1227; 17A C.J.S. p. 521; Note, 84 A.L.R.2d 322.) The Secretary of Transportation has statutory authority to bring suits to enforce compliance by recipients of grants under the Urban Mass Transportation Act. (49 U.S.C. §§ 1608(a), 1608(e); 12 U.S.C.A. § 1749a(c)(3).) One of the remedies

available to the United States, as to a private party, is specific performance. (*Dugan* v. *United States,* 16 U.S. (3 Wheat.) 172, 181 [4 L.Ed. 362, 364]; *United States* v. *Sumter County School District No. 2,* 232 F.Supp. 945, 950; *U. S.* v. *County School Bd. Prince George County, Va., supra,* 221 F.Supp. at p. 103; see also *U. S.* v. *San Francisco,* 310 U.S. 16, 30-31 [84 L.Ed. 1050, 1060-1061, 60 S.Ct. 749]; Conway, *The Federal Grant: An Administrative View,* 30 Fed. B.J. 119, 121-125; Tomlinson & Mashaw, *Federal Standards in Grant-In-Aid Programs: Suggestions for Beneficiary Involvement,* 58 Va.L.Rev. 600, 681-683.)

This suit was filed when the two public agencies had placed their disagreement in a state of administrative immobility. The impasse may be broken by either agency. If the transit district refuses to complete the project by installing bus stop shelters, the Secretary of Transportation may limit himself to withholding money payments or he may sue for damages or specific performance. We need not inquire whether the secretary's choice is an "election" in the sense that pursuit of one bars accomplishment of the other. The point here is that the choice of sanctions is the government's, not the local bus users' or the court's. The mandamus sought by petitioners would have the practical effect, of a decree of specific performance. It would obtrude upon the government's discretionary choice of contractual remedies. The bus users' need for passenger shelters may be conceded. They are but indirect beneficiaries of a grant whose primary obligee, the government, is quite able to protect its own interests. ██ Under the circumstances petitioners have failed to establish the beneficial interest necessary to sustain their application.

Judgment affirmed.

Regan, J., and Thompson, J.,* concurred.

A petition for a rehearing was denied January 22, 1974, and appellants' petition for a hearing by the Supreme Court was denied February 27, 1974.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.