[No. A062250. First Dist., Div. Three. Jan. 9, 1995.]

CALIFORNIA HOMELESS AND HOUSING COALITION et al.,
Plaintiffs and Appellants, v.
ELOISE ANDERSON, as Director, etc., Defendant and Appellant.

**COUNSEL**

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Charlton Holland, Assistant Attorney General, Stephanie Wald and Ralph M. Johnson, Deputy Attorneys General, for Defendant and Appellant.

Melinda Bird, Richard A. Rothschild, Beth Osthimer, Michael Keys, Robert Capistrano, Steven Bingham, Casey McKeever, Lucy Quacinella, Peter A. Schey, Mark D. Rosenbaum, Alan L. Schlosser, Ann Brick, Edward M. Chen, Matthew A. Coles and Margaret C. Crosby for Plaintiffs and Respondents.

**OPINION**

**CHIN, P. J.**—Eloise Anderson, as the Director of the California Department of Social Services (Department), appeals from the superior court's issuance of a writ of mandate directing the Department to reevaluate California's "need standard" under the Aid to Families with Dependent Children (AFDC)

program and to publish the results of the reevaluation. In issuing the writ, the court found that California had failed to comply with 42 United States Code section 602(h) (hereafter section 602(h)), which requires a state participating in the AFDC program to reevaluate its need standard at least once every three years and report the results of the reevaluation to the United States Department of Health and Human Services (HHS) and the public. The Department contends that the trial court erred in finding that California's reevaluation of its need standard did not satisfy section 602(h). We agree. Therefore, we reverse.

## BACKGROUND

AFDC is a categorical assistance program that the United States Congress established under the Social Security Act of 1935 (1935 Act). (*King* v. *Smith* (1968) 392 U.S. 309, 313 [20 L.Ed.2d 1118, 1123, 88 S.Ct. 2128].) Congress designed AFDC "to provide financial assistance to needy dependent children and the parents or relatives who live with and care for them." (*Shea* v. *Vialpando* (1974) 416 U.S. 251, 253 [40 L.Ed.2d 120, 125, 94 S.Ct. 1746].) Participating states and the federal government jointly fund the program. (*Daniels* v. *McMahon* (1992) 4 Cal.App.4th 48, 51 [5 Cal.Rptr.2d 404].) Although participation in AFDC is voluntary, a state that elects to participate must maintain a welfare system that complies with federal law. (*Green* v. *Obledo* (1981) 29 Cal.3d 126, 131 [172 Cal.Rptr. 206, 624 P.2d 256].) Thus, to be eligible for federal funds, a state must adopt a plan that conforms to the requirements of section 602 of the 1935 Act (42 U.S.C. § 602). (*Daniels, supra*, 4 Cal.App.4th at p. 51.)

AFDC plans must specify both a standard of need and a payment level. (*Everett* v. *Schramm* (3d Cir. 1985) 772 F.2d 1114, 1115.) The standard of need "is the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level." (*Shea* v. *Vialpando, supra*, 416 U.S. at p. 253 [40 L.Ed.2d at p. 125].) "It is the 'yardstick' for measuring financial eligibility for assistance . . . ." (*Quern* v. *Mandley* (1978) 436 U.S. 725, 737 [56 L.Ed.2d 658, 609, 98 S.Ct. 2068].) By contrast, the payment level is the amount the state actually pays to eligible households, which is a function of the number of household members and the amount of the household's other income. (*Green* v. *Obledo, supra*, 29 Cal.3d at pp. 131-132; *Everett, supra*, 772 F.2d at p. 1115.) Under AFDC, states have "broad discretion" in determining both the need standard and the payment level. (*Shea* v. *Vialpando, supra*, 416 U.S. at p. 253 [40 L.Ed.2d at p. 125].) Each participating state "is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." (*King* v. *Smith, supra*, 392 U.S. at pp. 318-319 [20 L.Ed.2d at p. 1126], fns. omitted.) "Thus,

some States include in their 'standard of need' items that others do not take into account. Diversity also exists with respect to the level of benefits in fact paid." (*Rosado* v. *Wyman* (1970) 397 U.S. 397, 408 [25 L.Ed.2d 442, 453, 90 S.Ct. 1207], fn. omitted.) States are free to set payment levels below their standards of need.[1] (*Id.* at pp. 408-409 [25 L.Ed.2d at pp. 453-454]; *Everett, supra*, 772 F.2d at p. 1115.)

In California, the Legislature sets the need standard and payment level statutorily. Welfare and Institutions Code section 11452 contains the need standard.[2] It sets forth a schedule for determining "[m]inimum basic standards of adequate care," and enumerates the needs that the schedule "is designed to ensure . . . ." Section 11450, subdivision (a), sets forth the payment level. Section 11453, subdivision (a), requires that the Department annually adjust the amounts set forth in sections 11450 and 11452 "to reflect any increases or decreases in the cost of living . . . ," directs that the adjustment "shall be calculated by the Commission on State Finance based on the changes in the California Necessities Index . . ." (CNI),[3] and sets forth the method for computing the annual adjustment. In 1990, however, the Legislature amended section 11453 by adding former subdivision (c), which provided: "(1) No adjustment shall be made under this section for the purpose of increasing the benefits under this chapter for the 1990-91 fiscal year to reflect any change in the cost of living. [¶] (2) Adjustments for the 1991-92 fiscal year and fiscal years thereafter pursuant to this section shall not include any adjustment to reflect increases for the cost of living for the 1990-91 fiscal year."[4] (Stats. 1990, ch. 456, § 4.)

As originally enacted, the AFDC program did not require states to reexamine or adjust their need standards. In 1968, Congress required that "the amounts used by the State to determine the needs of individuals [be] adjusted [by July 1, 1969,] to reflect fully changes in living costs since such

---

[1]"Congress was itself cognizant of the limitations on state resources from the very outset of the federal welfare program." (*Dandridge* v. *Williams* (1970) 397 U.S. 471, 478 [25 L.Ed.2d 491, 498, 90 S.Ct. 1153].) In recognition of this fact, it vested the states with the "power to determine who is 'needy' for purposes of AFDC." (*King* v. *Smith, supra*, 392 U.S. at p. 318, fn. 14 [20 L.Ed.2d at p. 1126].) Thus, the need standard " '. . . *must be defined by each [s]tate* . . .' " and " '. . . *depends upon the conditions existing in each [s]tate.*' " (*Ibid.*, italics added by the *King* court.)

[2]Unless otherwise indicated, all further statutory references are to the Welfare and Institutions Code.

[3]For purposes of section 11453, the CNI "means the weighted average changes for food, clothing, fuel, utilities, rent, and transportation for low-income consumers. . . ." (§ 11453, subd. (a).)

[4]The Legislature made corresponding amendments in sections 11450 and 11452. (Stats. 1990, ch. 456, §§ 1, 3.)

amounts were established, and any maximums that the State imposes on the amount of aid paid to families [be] proportionately adjusted . . . ." (42 U.S.C. § 602(a)(23).) However, this amendment to the AFDC program did not require any adjustment to account for subsequent inflation. (*Everett* v. *Schramm, supra,* 772 F.2d at p. 1115.)

In 1988, Congress enacted section 602(h), which lies at the heart of this lawsuit. (Pub.L. No. 100-485 (Oct. 13, 1988) § 404, 102 Stat. 2398.) Section 602(h)(1) provides: "Each State shall reevaluate the need standard and payment standard under its plan at least once every 3 years, in accordance with a schedule established by the Secretary [of HHS], and report the results of the reevaluation to the Secretary and the public at such time and in such form and manner as the Secretary may require."[5] (42 U.S.C. § 602(h)(1).) Pursuant to this directive, in February 1991, HHS issued action transmittal No. FSA-AT-91-7 (Action Transmittal), which discussed passage of section 602(h) and directed participating states to provide information regarding their need and payment standards as of October 1, 1990, by completing the attached initial reporting form (FSA 111) and returning it within 60 days.

On August 6, 1991, California submitted its FSA 111 to HHS, reporting information as of October 1, 1990. It reported that the need standard as of October 1, 1990, had been in effect since July 1, 1989, and had last been reevaluated on June 29, 1990.[6] An attachment explained: "There have been cost of living adjustments since 1971 which have been based on the appropriate components of the Consumer Price Index for all Urban Consumers and calculations by the Commission on State Finance. The schedule of minimum basic standards of adequate care set up by the Legislature has been adjusted by these factors." It further explained: "The cost-of-living adjustment which has been added to the flat grant levels established legislatively in 1971 is based on changes in the California Necessities Index. This Index is

---

[5]Section 602(h)(2) provides: "The report required by paragraph (1) shall include a statement of—[¶] (A) the manner in which the need standard of the State is determined, [¶] (B) the relationship between the need standard and the payment standard (expressed as a percentage or in any other manner determined by the Secretary to be appropriate), and [¶] (C) any changes in the need standard or the payment standard in the preceding 3-year period." (42 U.S.C. § 602(h)(2).) Section 602(h)(3) requires the Secretary to "report promptly to the Congress the results of the reevaluations required by paragraph (1)."

[6]On June 29, 1990, the Governor approved a bill that delayed the effective date of the cost-of-living adjustment for 1990-1991 from July 1, 1990, to August 1, 1990, "unless another act which bec[a]me[] effective prior to August 1, 1990, shorten[ed] or extend[ed] the suspension period . . . ." (Stats. 1990, ch. 188, § 2.) The Legislature passed this measure to give itself "sufficient time in which to take proper action regarding the effects of the expected state budget shortfall . . . ." (Stats. 1990, ch. 188, § 3.) It later passed the amendments to the Welfare and Institutions Code that completely suspended the 1990-1991 adjustment.

reflective of the weighted average changes for food, clothing, fuel, utilities, rent, and transportation for low-income consumers." The FSA 111 requested documentation discussing "the statutory/regulatory requirement, frequency and method of adjustment to the previously set [need] standard." In response, California attached copies of sections 11450, 11452, and 11453 as they read at that time. The copies of these sections that California submitted indicated that there would be no cost-of-living adjustment for the 1990-1991 fiscal year and that subsequent cost-of-living adjustments would not reflect a cost-of-living increase for the 1990-1991 fiscal year.

In June 1992, respondents California Homeless and Housing Coalition, Sonja Blutgarten, Belen Reyes, and Tammy Schutte (collectively referred to as the Coalition) filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1085. The petition alleged that, to comply with section 602(h), the Department had to "determine the actual cost of purchasing the basic needs identified by the state as essential for AFDC families . . . and compare this to the current need standard." It further alleged that the Department had "violated [section] 602(h) by failing to conduct the required reevaluation" and by failing to report the results of its reevaluation to the public.

The Department demurred to the petition, arguing that section 602(h) did not afford the Coalition a private right of action and that California had, in any event, complied with section 602(h). The superior court overruled the demurrer. In a tentative ruling on the writ petition, the court explained: "While Section 402(h) [sic] does not determine the method by which the State must reevaluate the needs standard every three years, it does mandate that a reevaluation be performed, as do the HHS directions. The State need not necessarily perform a new study, and the use of the CNI index is permissible. However, use of a suspended CNI index is not the use of such an index at all, and hence is inconsistent with the requirement that a reevaluation be performed." After receiving supplemental briefs, the court granted the petition, finding that the Department had "failed to conduct and report to the public any reevaluation which would satisfy the mandates of" section 602(h). It then issued a peremptory writ of mandate directing the Department "to conduct a reevaluation of" California's "AFDC statewide need standard which reflects the money necessary to purchase basic necessities for a California family, based upon the needs identified in [section] 11452," and "to make public the results of said reevaluation through the publication of a document to be made available to members of the general public." This timely appeal followed.

Discussion

## I. *Availability of Mandamus Relief*

As it did in its demurrer below, the Department contends on appeal that the Coalition is not entitled to seek enforcement of section 602(h) through mandamus under Code of Civil Procedure section 1085. We disagree.

A court may issue a writ of mandamus "only to persons who are 'beneficially interested.' (Code Civ. Proc., § 1086.)" (*Green v. Obledo, supra*, 29 Cal.3d at p. 144.) Ordinarily, this requires that a petitioner have "some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large. [Citations.]" (*Carsten v. Psychology Examining Com.* (1980) 27 Cal.3d 793, 796 [166 Cal.Rptr. 844, 614 P.2d 276].) However, our Supreme Court has "recognized an exception to the general rule ' "where the question is one of public right and the object of the mandamus is to procure the enforcement of a public duty . . ." ' [citation]." (*Green, supra*, 29 Cal.3d at p. 144.) Under these circumstances, the petitioner " ' ". . . need not show that he has any legal or special interest in the result, since it is sufficient that he is interested as a citizen in having the laws executed and the duty in question enforced" ' [citation]. The exception promotes the policy of guaranteeing citizens the opportunity to ensure that no governmental body impairs or defeats the purpose of legislation establishing a public right. [Citation.]" (*Ibid.*) In *Green*, the Supreme Court applied this exception specifically in the AFDC context, stating: "There can be no question that the proper calculation of AFDC benefits is a matter of public right [citation] . . . ." (*Id.* at p. 145; see also *Timmons v. McMahon* (1991) 235 Cal.App.3d 512, 518 [286 Cal.Rptr. 620].) We find it similarly applicable in this case.[7]

We disagree with the Department's contention that "*Greens'* [*sic*] continued viability is questionable" in light of the United States Supreme Court's decision in *Suter v. Artist M.* (1992) 503 U.S. 347 [118 L.Ed.2d 1, 112 S.Ct. 1360]. In *Suter*, the court determined that private individuals could not bring suit under 42 United States Code section 1983 (hereafter section 1983) to enforce a provision of the Adoption Assistance and Child Welfare Act of 1980. (*Suter, supra*, 503 U.S. at p. 350 [118 L.Ed.2d at p. 8, 112 S.Ct. at p. 1363].) The court reached this conclusion after finding that the provision "neither confers an enforceable private right on its beneficiaries nor creates

---

[7]Given this conclusion, we need not address the alternative contention that taxpayer standing exists under Code of Civil Procedure section 526a.

an implied cause of action on their behalf." (*Id.* at p. 364 [118 L.Ed.2d at p. 16, 112 S.Ct. at p. 1370].)

However, given the limited nature of the remedy section 1983 affords, the court's conclusion does not necessarily impact the broader remedy available under Code of Civil Procedure section 1085. Although section 1983 "provides a remedy for violations of federal statutes as well as the [United States] Constitution . . . ," a "violation of a federal statute is not by itself sufficient to support a [section] 1983 action. Since [section] 1983 'speaks in terms of "rights, privileges, or immunities," not violations of federal law,' [citation]," its applicability depends on the existence of a private right of enforcement. (*Clifton* v. *Schafer* (7th Cir. 1992) 969 F.2d 278, 283; see also *Suter* v. *Artist M., supra,* 503 U.S. at pp. 357-358 [118 L.Ed.2d at pp. 12-13, 112 S.Ct. at p. 1367].) By contrast, Code of Civil Procedure section 1085 authorizes issuance of a writ "to compel the performance of an act which the law specially enjoins . . . ." By statute, it is available not only to those who have enforceable private rights, but to those who are "beneficially interested" parties within the meaning of Code of Civil Procedure section 1086. "[W]here a public right is involved, and the object of the writ of mandate is to procure enforcement of a public duty," a citizen is beneficially interested within the meaning of this section if "he is interested in having the public duty enforced. [Citations.]" (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 158 [217 Cal.Rptr. 893].) Thus, while the absence of a privately enforceable right renders section 1983 inapplicable, it does not necessarily render mandamus relief under Code of Civil Procedure section 1085 unavailable. *Suter,* therefore, does not alter our conclusion.

Nor do we agree with the Department's contention that *McDonald* v. *Stockton Met. Transit Dist.* (1973) 36 Cal.App.3d 436 [111 Cal.Rptr. 637] requires a different result. There, two individuals sought to compel a transit district to install twenty bus shelters pursuant to a federal contract. (*Id.* at pp. 437-438.) The court generally explained: "The exercise of jurisdiction in mandamus rests to a considerable extent in the wise discretion of the court. [Citation.] In exercising this discretion the courts balance the applicant's need for relief (i.e., his beneficial interest) against the public need for enforcement of the official duty. When the duty is sharp and the public need weighty, the courts will grant a mandamus at the behest of an applicant who shows no greater personal interest than that of a citizen who wants the law enforced. [Citations.] When the public need is less pointed, the courts hold the petitioner to a sharper showing of personal need." (*Id.* at p. 440.) Applying these principles to the facts at hand, the *McDonald* court concluded

that the individuals "failed to establish the beneficial interest necessary to sustain their application." (*Id.* at p. 443.) The court cited the fact that the individuals were essentially seeking specific performance of a contract even though the federal government had not alleged a breach of that contract, and that granting relief would interfere with the government's discretionary choice of contractual remedies. (*Id.* at pp. 442-443.) Applying the same principles to the facts in this case, we reach a different conclusion. The public need here at issue is of much greater weight than the need at issue in *McDonald*. Moreover, the Coalition's action does not threaten to interfere with the government's choice of remedies under an express contract. Rather, it seeks, at least in part, to have California comply with its duty *to the public* under section 602(h) to report the results of its reevaluation. Given these factual differences, our conclusion is not contrary to *McDonald*.

## II.  *California Has Complied With Section 602(h)*

■ The question this action presents is whether California complied with section 602(h)'s requirement that it "reevaluate the need standard and payment standard under its [AFDC] plan . . . and report the results of the reevaluation to the Secretary and the public at such time and in such manner as the Secretary may require." Congress enacted this provision as part of the Family Support Act of 1988. (102 Stat. 2343, 2398.) A Senate Finance Committee Report explained section 602(h) as follows: "Under present law, each State determines the 'need standards' for families of various sizes. . . . These [*sic*] are no Federal rules governing how States establish their need and payment standards or how often they must review or revise them. [¶] . . . The Committee bill does not change the present law flexibility which allows each State to establish its own need and payment standards for assistance. However, States will be required to undertake a reevaluation of these standards at least once every 5 years. The bill does not require that States modify the standards as a result of the reevaluation, but they will be required to report the results to the Secretary who must in turn report to the Congress."[8] (Sen.Rep. No. 100-377, 100th Cong., 2d Sess., p. 49 (1988), 1988 U.S. Code Cong. & Admin. News, p. 2826.) As the Coalition notes, this committee report shows that, in passing section 602(h), "Congress distinguished between a reevaluation of the need standard, on the one hand, and a state's re-adoption or resetting of its standard, on the other," and "did not directly require states to increase their AFDC need or payment standards."

Based on the evidence in the record, we find that California's 1990 reevaluation of its need standard satisfied section 602(h). According to the

---

[8]Prior to passing section 602(h), Congress changed the reevaluation period to at least once every three years. (See H.R.Conf.Rep. No. 100-998, 100th Cong., 2d Sess., p. 183 (1988), 1988 U.S. Code Cong. & Admin. News, p. 2971.)

declaration of the director of economic and revenue forecasting for the California Commission on State Finance, "[e]ach year since 1980, the Commission on State Finance has calculated the change in the CNI, using the methodologies prescribed by the Welfare & Institutions Code . . . ." A table that the Department submitted shows that, for the 1990-1991 fiscal year, the statutory cost-of-living adjustment was calculated to be 4.62 percent. The table explains, however, that the Legislature "suspended the 4.62 percent [cost-of-living adjustment] that would have been applied July 1, 1990 . . . to help bridge the budget gap of $3.6 billion." Similarly, the declaration of the chief of the Department's AFDC policy implementation bureau explains: "Each year the Commission on State Finance computes the annual self-implementing CNI adjustment . . . . Thereafter, the Legislature evaluates the appropriateness of the CNI adjustment . . . . [¶] . . . For state fiscal year 1990-1991, during budget deliberations, the Legislature was cognizant of the fiscal problem of balancing the increases in the AFDC program due to caseload and statutory CNI growth, to available state revenues. Thus, the Legislature re-evaluated the degree to which the need and payment standards should rise and publicly chose to hold the standards at the 1989 levels."[9] Keeping in mind that section 602(h) does not require states to implement the results of their reevaluation, we find that the Legislature's consideration of the cost-of-living adjustment for 1990 and its decision not to implement that adjustment satisfies section 602(h).[10]

We further find that the FSA 111 that California submitted to HHS satisfied its duty under section 602(h) to report the results of its reevaluation to that agency. The FSA 111 set forth California's need standard, explained that the need standard had last been reevaluated on June 29, 1990, and generally explained the method by which California adjusted its standard over the years. As we previously noted, along with the FSA 111, California submitted copies of sections 11450, 11452, and 11453 as they read at the time. Those sections explained the duty of the California Commission on

---

[9]The statutory history of the 1990 amendments to sections 11450, 11452, and 11453 confirms these facts. According to a Senate Rules Committee Report on Assembly Bill No. 3573, which proposed the amendments, "[u]nder [then-]current law, the statutory [cost-of-living adjustment would have been] 4.62 percent in 1990-91 effective on various dates," and implementation of this adjustment "would have increased grants by $32 per month (to $726) for a family of three," costing a total of $114 million in AFDC payments. (Sen. Rules Com. Rep. on Assem. Bill No. 3573 (July 17, 1990) pp. 2, 3, 5 (1989-1990 Reg. Sess.).) With full knowledge of these calculations, the Legislature suspended the adjustment to "help reduce the 1990-91 budget shortfall." (Dept. of Social Services, Enrolled Bill Rep. for Assem. Bill No. 3573 (1989-1990 Reg. Sess.) July 30, 1990.)

[10]On appeal, the Coalition discusses changes to California's need and payment standards that the Legislature enacted for subsequent years. These developments are irrelevant to determining the adequacy of the reevaluation that California reported in 1990.

State Finance to calculate a cost-of-living adjustment and the method for making that calculation. They also explained that there would be no cost-of-living adjustment for the 1990-1991 fiscal year and that subsequent cost-of-living adjustments would not reflect a cost-of-living increase for the 1990-1991 fiscal year. Submission of this information satisfied California's duty under section 602(h) to report the results of its reevaluation to HHS.[11]

HHS's position regarding the sufficiency of California's reevaluation and its report supports our conclusion. The Department submitted to the trial court the declaration of Jason Turner, who identified himself as the director of family assistance of HHS and stated that he was "responsible for the federal oversight and administration of the [AFDC] program."[12] According to the declaration, HHS "consider[s] California to have met the requirements of [the agency] and of section 402(h) [sic] . . . that 'each state shall reevaluate the need standard under its plan at least once every three years . . . .'" Turner further observed: "The states have used a variety of methods to reevaluate their need and payment standards. Some states have reevaluated their need and payment standards using weighted consumer price index data for their area, some have conducted surveys, and others, like California, have utilized an index which specifically targets the AFDC population. All of these methods are reasonable and comply with the requirements of the [1935] Act." Finally, Turner noted that, while section 602(h) "requires States to reevaluate and report their need and payment standards," it "does not require a study to be performed or the need and payment standards to be changed." Because HHS is the agency charged with administration of the AFDC program, its interpretation of section 602(h), and its conclusion that California satisfied the demands of that statute, are entitled to substantial deference.[13] (*Blum* v. *Bacon* (1982) 457 U.S. 132, 141 [72 L.Ed.2d 728, 736, 102 S.Ct. 2355]; *Quern* v. *Mandley, supra,* 436 U.S. at p. 738 [56 L.Ed.2d at pp. 669-670].)

---

[11]While noting that, from the materials California submitted, "it is possible to determine that the cost-of-living adjustments were suspended in 1990 . . . ," the Coalition asserts that "[s]uch a discovery would be unlikely . . . given the fact that the report does not mention this fact and the print in the copies of the pocket part is tiny and barely legible." However, we do not find that the submitted materials are difficult to read. Moreover, in the copies of the relevant statutes that California submitted, which were made from the 1991 supplementary pamphlet to the Welfare and Institutions Code, the amendments that indicated suspension of the 1990-1991 adjustment were underscored.

[12]As director, Turner signed the Action Transmittal.

[13]The Coalition's arguments against affording deference to HHS's position are unpersuasive. The Coalition first argues that "HHS merely accepted at face value the state's claim that it had conducted a reevaluation." However, according to Turner's declaration, after California submitted the FSA 111, HHS "contacted the State . . . to obtain further information regarding the basis for their [sic] need and payment standards." California responded by "submitt[ing] this information in the form of records from Public Hearings conducted by the State Social Welfare Board." The Coalition further asserts that Turner's statement is entitled to

The Coalition offers two primary arguments in support of the superior court's decision. First, it contends that "the plain meaning of the requirement to (re)evaluate the need standard means to (re)ascertain the monetary value of an AFDC family's essential needs . . . ," and that "[a] mere description or resetting of the need standard, without comparing it to the current cost of basic needs, is inconsistent with the plain meaning of the statute."[14] Second, it contends that Congress's goal in passing section 602(h) was "to promote political accountability by exposing the inadequacy of the current payment levels," and that "[t]he [D]epartment's interpretation of the statute permits states to avoid this accountability . . . ."[15]

The Third Circuit Court of Appeals's decision in *Everett* v. *Schramm, supra,* 772 F.2d 1114, answers these contentions. At issue in *Everett* was the State of Delaware's implementation of the AFDC program. Effective January 1, 1984, Delaware repealed a statute that provided for annual adjustments to its need standard in accordance with increases in the consumer price index and lowered the existing need standard. (*Id.* at pp. 1116-1117.) Plaintiffs challenged this statutory change, arguing that it violated federal law because it was arbitrary in that it was "not supported by any evidence of an actual reduction in the cost of meeting basic needs . . . ." (*Id.* at p.

little deference because it "is not an official HHS interpretation of the statute," and HHS "has not exercised its rulemaking authority . . . ." In making this assertion, the Coalition cites Turner's statement that "[t]he Administration for Children and Families has no interpretation of section 402(h) [*sic*] other than the plain language of the Family Support Act . . . as expressed in" the Action Transmittal. However, "[p]romulgation of a regulation . . . is not a prerequisite for according respect to an agency interpretation. [Citation.]" (*Deel* v. *Jackson* (4th Cir. 1988) 862 F.2d 1079, 1087.) As the United States Supreme Court has directed, "[w]henever possible the . . . courts should obtain the views of [HHS] in those cases where it has not set forth its views, either in a regulation or published opinion . . . ." (*Rosado* v. *Wyman, supra,* 397 U.S. at pp. 406-407 [25 L.Ed.2d at p. 452].) Here, reliance on the statements of Turner, who was responsible for federal oversight and administration of the AFDC program, is appropriate. (See *Howard* v. *Madigan* (D.S.D. 1973) 363 F.Supp. 351, 353-354; *Jackson* v. *Department of Public Welfare of State of Fla.* (M.D.Fla. 1970) 317 F.Supp. 1151, 1160-1161, fn. 6 and accompanying text.)

[14]Similarly, the dissent purports to rely on the "plain language" of section 602(h), explaining that the word " 'evaluate' " means "to 'estimate or ascertain the monetary worth of' something. [Citation.]" (Conc. & dis. opn., *post,* at p. 465.) Even this definition, however, does not necessarily support the dissent's view. It speaks alternatively of ascertaining *or estimating* the monetary worth of something. The latter term contemplates a less rigorous examination than the dissent apparently envisions.

[15]The Coalition also argues that a state cannot provide the information that the Action Transmittal requests without "conduct[ing] a study to determine actual costs for a California AFDC family." However, the FSA 111, after instructing states to explain "the basis for concluding that the standard of need reflects the money necessary to purchase basic necessities . . . ," directs: "*If* a formal study was conducted, provide the date that the study was completed and attach a copy of the report to this document." (Italics added.) The conditional nature of the latter statement rebuts the Coalition's claim that a study is mandatory.

1120.) The court disagreed, finding that federal law only prohibited reductions below the July 1, 1969, standard of need, and did not otherwise prohibit even "arbitrary" reductions that were "not supported by any corresponding actual reduction in the cost of meeting basic needs." (*Ibid.*) Plaintiffs also argued that the federal policy of honesty "prevents a state from reducing the inflation-adjusted *levels* of the standard of need absent a demonstration that previously recognized inflation is no longer a reality of existence." (*Id.* at p. 1121.) Again the court disagreed, finding that the federal policy prevented a state from eliminating expense items that it had included in setting its 1969 need standard, but did not require the state to raise "the actual dollar amounts it officially deems necessary to cover these expenses . . . ." (*Id.* at p. 1122.) In terms of political accountability, the court found that "[t]he failure of Delaware's current standard of need (and its payment levels) to reflect inflation that has occurred since 1968 is there for the public to see, as is the dramatic and seemingly unjustified reduction that took place between 1983 and 1984." (*Ibid.*)

Although the Third Circuit decided *Everett* before Congress enacted section 602(h), its reasoning is equally applicable to rebut the similar arguments that the Coalition makes in this case. (*Everett* v. *Schramm, supra,* 772 F.2d at pp. 1119-1122.) We find no evidence that, in imposing on participating states the duty to reevaluate their need and payment standards, Congress also intended to impose a new duty to determine the actual costs of meeting basic needs.[16] As the Senate Finance Committee Report expressly states, section 602(h) did "not change the . . . flexibility which allows each State to establish its own need and payment standards for assistance." (Sen. Rep. No. 100-377, 100th Cong., 2d Sess., p. 49, *supra,* 1988 U.S. Code Cong. & Admin. News, at p. 2826.) While section 602(h) imposes a new requirement that states review their need and payment standards at least once every three years, [17] it "does not require that States modify the standards as a result of the reevaluation . . . ." (*Ibid.*) Again, HHS's approval of California's reevaluation, which is entitled to substantial deference, supports our decision.[18]

Given our conclusion, we also reverse that part of the writ that requires the Department "to make public the results" of its reevaluation "through the

---

[16]In light of our conclusion, we need not address the Coalition's argument that using the CNI to review the need and payment standards is inadequate because the figures to which the CNI is applied are arbitrary and do not reflect the actual costs of meeting basic needs. (See also *Jackson* v. *Department of Public Welfare of State of Fla., supra,* 317 F.Supp. at pp. 1159-1161 [rejecting contention that cost-of-living adjustment of need standard that does not accurately reflect living costs violates federal law].)

[17]Imposition of this requirement rebuts the Coalition's assertion that approval of California's reevaluation would render section 602(h) a nullity. Under prior law, states had no duty to review their need and payment standards.

[18]The dissent declares: "In my view the 'results' of the need standard reevaluation refers to a conclusion about the true cost of supplying basic needs." (Conc. and dis. opn., *post,* at p.

publication of a document to be made available to members of the general public." The court's order in this regard resulted from its finding that the Department had "failed to conduct and report to the public any reevaluation which would satisfy the mandates of" section 602(h). The court's reasoning followed the Coalition's primary argument below that "[b]ecause the [Department] ha[s] failed to conduct a reevaluation, [it] ha[s] not and cannot report on the results of a reevaluation." Since we find that the reevaluation was adequate, the basis for the court's publication order no longer exists.

We further find that the information California submitted to HHS and the codification of the reevaluation through the amendments to the Welfare and Institutions Code that suspended the cost-of-living adjustment for 1990-1991 satisfied California's duty under section 602(h) to report the results of its reevaluation to the public. Those materials both explained the method for calculating the adjustment to the need standard, and that the adjustment would not be implemented for 1990-1991.[19] Moreover, because California's duty under section 602(h) is to "report the results of the reevaluation to the Secretary and the public *at such time and in such form and manner as the Secretary may require*" (italics added), the fact that HHS considers that California has satisfied its duties under section 602(h) strongly supports our conclusion.

The order issuing the writ of mandate is reversed, and the court is directed to discharge the writ and enter judgment denying the petition. The Department is awarded costs.

Merrill, J., concurred.

---

466.) Citing passage of Assembly Bill No. 3829 (AB 3829) (1993-1994 Reg. Sess.), the dissent further "note[s] that although the HHS may have found California's reevaluation acceptable, the state Legislature did not." (Conc. and dis. opn., *post,* at p. 469, fn. 7.) The dissent thus would substitute either its own or the Legislature's judgment for that of HHS, which found California's reevaluation acceptable. This is contrary to section 602(h), which directs *HHS* to determine the "time," "form and manner" of reporting. Moreover, the dissent reads too much into passage of AB 3829. The Legislature's decision to include a study of actual costs in a reevaluation does not necessarily indicate its belief that all other reevaluation methods are inadequate under section 602(h). As Turner's declaration explains, there are other reasonable methods for complying with section 602(h). Even the dissent concedes that a "State need not use any particular method to reevaluate its need standard, and use of the CNI is certainly acceptable." (Conc. and dis. opn., *post,* at p. 469, fn. omitted.) In vetoing AB 3829, the Governor noted that federal law already required California to reevaluate its need standard every three years, and expressed his belief that "[t]he State is currently in compliance with this requirement of federal law." (Governor's Veto Message to Assem. on Assem. Bill No. 3829 (Sept. 27, 1994) 21 Assem. J. (1993-1994 Reg. Sess.) p. 9427.)

[19]Given that the Legislature enacted separate amendments to the Welfare and Institutions Code to declare that it was suspending the cost-of-living adjustment for 1990-1991, we disagree with the dissent that California has tried to "blur the public's vision in order to avoid political accountability for its decisions." (Conc. and dis. opn., *post,* at p. 470.)

WHITE, J.,* Concurring and Dissenting.—I concur in the majority opinion to the extent it holds that mandamus relief was available to petitioners California Housing and Homeless Coalition. However, I dissent from that portion of the majority opinion which holds that California (State) has complied with 42 United States Code section 602(h) (sometimes referred to herein as section 602(h)). I would affirm the judgment of the lower court on this point.

At the heart of this case lies a disagreement concerning the kind of reevaluation section 602(h) requires. Petitioners contend the State must reevaluate the need standard every three years to determine whether it reflects the *true cost* of obtaining essential needs such as food, clothing, and shelter. The State, on the other hand, maintains that "reevaluation" merely means that it must set a need standard by balancing available fiscal resources against the social needs of Aid to Families with Dependent Children (AFDC) recipients. In other words, petitioners argue that section 602(h) requires states to make a good faith effort to determine the *true cost* of obtaining basic necessities, while the State contends it must merely establish a need standard based on its own fiscal concerns, without first determining the true cost of providing basic necessities. Importantly, even petitioners concede that the State need not *change* its need standard in light of the section 602(h) reevaluation; instead, it must merely publicize the results of the reevaluation in a way that clearly exposes the inadequacy of the payment standard.

I believe petitioners have the better of the argument. Consequently, I would affirm the portion of the writ of mandate which compels the State to reevaluate the need standard to determine the amount of money needed to purchase basic necessities in California and to report those results to the public.

I

The federal statute provides that "[e]ach State shall reevaluate the need standard . . . under its plan at least once every 3 years . . . and report the results of the reevaluation to . . . the public . . . ." (42 U.S.C. § 602(h)(1).) The plain language of the statute imposes a duty on states to do more than simply leave the need standard unchanged based on fiscal constraints, as California has done here. To "evaluate" means to "estimate or ascertain the monetary worth of" something. (Webster's Third New Internat. Dict. (1970) p. 786.)

---

*Retired Presiding Justice of the Court of Appeal, First District, sitting under assignment by the Chairperson of the Judicial Council.

The standard of need is "a dollar figure set by each State reflecting the amount deemed necessary to provide for essential needs, such as food, clothing, and shelter." (*Quern* v. *Mandley* (1978) 436 U.S. 725, 737 [56 L.Ed.2d 658, 609, 98 S.Ct. 2068], fn. omitted.)

Thus, to "reevaluate" the need standard means to reascertain or reestimate the monetary cost of providing essential needs such as food, clothing, and shelter. A state does not "reevaluate" its need standard when it merely retains or resets that standard without relating that exercise to the current cost of obtaining basic necessities.

The legislative history of section 602(h) supports my interpretation of the statute. Section 602(h) was enacted as part of the Family Support Act of 1988.[1] (102 Stat. 2343, 2398.) With respect to section 602(h), a Senate Finance Committee Report explained that "[u]nder present law, each State determines the 'needs standards' for families of various sizes. . . . [¶] The Committee bill does not change the present law flexibility which allows each state to establish its own need and payment standards for assistance. However, States will be required to undertake a reevaluation of these standards at least once every 5 [later changed to 3][2] years. The bill does not require that States modify the standards as a result of the reevaluation, but they will be required to report the results to the Secretary who must in turn report to the Congress." (Sen.Rep. No. 100-377, 100th Cong., 2d Sess., p. 49 (1988), 1988 U.S. Code Cong. & Admin. News, p. 2826.)

The Senate report shows that Congress distinguished between a reevaluation of the need standard, on the one hand, and a state's resetting or readoption of the need standard, on the other. The Senate report makes it clear that while a state must report the results of its reevaluation to the public, it need not implement those results. In my view, the "results" of the need standard reevaluation refers to a conclusion about the true cost of supplying basic needs.

Petitioners contend—and I agree—that requiring the states to reevaluate their need standards and to report the reevaluation to the public is Congress's

---

[1] The Family Support Act of 1988 was born of a compromise between separate House and Senate versions of the law. Both the Senate and House versions included reevaluation provisions, although they differed in their terms. The Conference Committee adopted a compromise version of the competing provisions, resulting in current section 602(h). (H.R.Conf.Rep. No. 100-998, 100th Cong., 2d Sess., pp. 91, 183 (1988), 1988 U.S. Code Cong. & Admin. News at pp. 2879, 2971.)

[2] See House of Representatives Conference Report No. 100-998, 100th Congress, Second Session, at p. 183 *supra*, 1988 United States Code Congressional and Administrative News at page 2971.

way of increasing political accountability for a state's decision to set payment levels which do not meet the basic needs of AFDC recipients. Congress did something similar in 1967 when it required states to make a one time adjustment to their AFDC need standards to fully reflect changes in living costs. (42 U.S.C. § 602(a)(23); *Rosado* v. *Wyman* (1970) 397 U.S. 397, 407 [25 L.Ed.2d 442, 452-453, 90 S.Ct. 1207].) Although this provision did not require the states to increase *payments* to AFDC recipients, the Supreme Court reasoned that it forced the states "to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs [fell] short of fulfilling actual need . . . ." (*Rosado*, *supra*, at pp. 412-413 [25 L.Ed.2d at p. 456].) The high court continued: "The congressional purpose we discern does not render § [6]02(a)(23) a meaningless exercise in 'bookkeeping.' Congress sometimes legislates by innuendo, making declarations of policy and indicating a preference while requiring measures that, though falling short of legislating its goals, serve as a nudge in the preferred directions." (*Id.*, at p. 413 [25 L.Ed.2d at p. 456].) By requiring states to update their need standards, the states were forced to accept the political consequences of "actual assistance [which] falls short of the minimum acceptable." (*Ibid.*; see also *Matter of Rulemaking, N.J.A.C. 10:82-1.2* (1989) 117 N.J. 311 [566 A.2d 1154, 1158-1160].)[3]

Although Congress did not go as far in section 602(h) (which requires a *reevaluation* of the need standard) as it did in section 602(a)(23) (which required an actual *adjustment* of the need standard),[4] I nevertheless believe Congress's basic goal was the same in both situations: namely, to promote political accountability by exposing the inadequacy of current payment

[3]In a report which studied the relationship between AFDC need standards and payment standards, the authors "found a strong positive correlation between the size of increases in payments and the size of the gap between need and payment standards. In both states with relatively generous benefits and those with relatively ungenerous benefits, benefits tended to increase faster where there was a significant distance between the need and payment standards. The authors speculate that, while need standards are highly manipulable, some states took them seriously, and good faith efforts to estimate need often resulted in standards above program payments. These standards in turn, the authors further speculate, exercised a kind of normative pressure on legislators that prompted benefit increases." (Simon, *Rights and Redistribution in the Welfare System* (1986) 38 Stan.L.Rev. 1431, 1489 fn. 190, quoted in *Matter of Rulemaking, N.J.A.C. 10:82-1.2, supra*, 566 A.2d at pp. 1159-1160.)

[4]The reason for this softening may have to do with changes in the importance of the standard of need. In 1967 AFDC mandated no particular relationship between the level of benefits paid and the standard of need. However, the standard of need took on greater significance in 1981 when Congress enacted legislation which created a ceiling for eligibility based on the standard of need and family income (42 U.S.C. § 602(18)) and made the standard of need important to other calculations (42 U.S.C. § 602(a)(31)). (*Everett* v. *Schramm* (3rd Cir. 1985) 772 F.2d 1114, 1115-1116.) Thus, in 1988 Congress may have been reluctant to force states to adopt new standards of need since this would directly affect how the states calculated and determined eligibility for benefits.

levels, while respecting the state's traditional autonomy in setting AFDC standards. California's interpretation of the statute would permit states to avoid this accountability, because it allows them to "reevaluate" their need standards without relating that exercise to the true cost of meeting basic needs, and without reporting the results of the reevaluation in a manner easily understood by the public.

## II

Having determined that section 602(h)(1) requires states to make a good faith effort to determine the true cost of obtaining basic necessities and to report that reevaluation to the public, I next consider whether California's 1991 section 602(h) reevaluation satisfied that duty. I conclude that it did not.

As indicated, California reported to the United States Department of Health and Human Services (HHS) that it had last reevaluated its need standard on June 29, 1990. In California, the need standard is legislatively established by Welfare and Institutions Code section 11452, subdivision (a)(1).[5] The statute lists the basic needs which the need standard is intended to meet.[6] In addition, another statute provides for automatic annual adjustments to the need standard based on changes in the cost of living, as reflected in the California Necessities Index (CNI). (Welf. & Inst. Code,

---

[5]The current need standards (or minimum basic standards of adequate care, as they are called in the California statute) are:

| "Number of needy persons in the same family | Minimum basic standards of adequate care |
|:---:|:---:|
| 1 | $ 341 |
| 2 | 560 |
| 3 | 694 |
| 4 | 824 |
| 5 | 940 |
| 6 | 1,057 |
| 7 | 1,160 |
| 8 | 1,265 |
| 9 | 1,371 |
| 10 | 1,489 |

plus fourteen dollars ($14) for each additional person." (Welf. & Inst. Code, § 11452, subd. (a)(2).)

[6]These needs include safe and healthful housing, minimum clothing for health and decency, low cost food budget, utilities, nonpublic essential medical and dental care, and other miscellaneous personal needs and expenses. (Welf. & Inst. Code, § 11452, subd. (a)(1)(A)-(F).)

§ 11453, subd. (a).) However, since 1971 the cost-of-living adjustment has been repeatedly reduced or suspended, and was in fact suspended in the 1990-1991 fiscal year, the very year California represented that it had last "reevaluated" its need standards. (Welf. & Inst. Code, § 11452, subd. (a)(3).) As the trial court observed, reevaluation by using a suspended cost-of-living index is no reevaluation at all. Further, the fact that HHS accepted California's reevaluation report is of little moment where "as here, the so-called approval does not appear to have followed explicit attention to the question now confronted." (*Fabula* v. *Buck* (4th Cir. 1979) 598 F.2d 869, 873, fn. 11 [approval of state medicade plan]; see also *Independent Nursing Home* v. *Simmons* (S.D.Miss. 1990) 732 F.Supp. 684, 688 same].)[7]

Again, I wish to stress that the State need not use any particular method to reevaluate its need standard, and use of the CNI is certainly acceptable.[8] However, the state must at minimum make a good faith effort to determine the true cost of obtaining basic necessities *and* report that reevaluation to the public in a manner that "lay[s] bare the extent to which [its] programs fall short of fulfilling actual need . . . ." (*Rosado* v. *Wyman, supra,* 397 U.S. at pp. 412-413 [25 L.Ed.2d at p. 456].) In my view, the State has gone out of its way to *bury* (rather than "lay bare") the extent to which its programs fall short of actual need.

I believe section 602(h) serves an important purpose which California has attempted to thwart. The section 602(h) reevaluation is an informational exercise, akin, perhaps, to an environmental impact report. It does not compel a particular decision, but hopefully makes for more informed (and public) decisionmaking. As the Supreme Court of New Jersey observed in a similar context, ". . . it is a simple fact of human experience needing no empirical demonstration that not until we see the face of poverty do we react to it. . . . [¶] . . . [T]here is every reason to believe that an informed

---

[7]I note that although the HHS may have found California's reevaluation acceptable, the state Legislature did not. On August 24, 1984, while this case was pending, the Legislature passed Assembly Bill No. 3829 (1993-1994 Reg. Sess.). That bill would have required the Department of Social Services to "contract with an independent, qualified, and reputable public or private entity for the reevaluation required by" section 602(h). Assembly Bill No. 3829 further stated that the reevaluation "*shall* contain a study of the *actual costs* of subsistence needs for the families in the state . . . ." (Assem. Bill No. 3829, *supra,* § 1, italics added.) However, Governor Wilson vetoed Assembly Bill No. 3829 on September 27, 1994.

[8]Petitioners also argue that merely using the CNI to calculate the need standard is unacceptable. Given that the states have broad discretion to set, and therefore to reevaluate, their need standards, I would not place any limits on the state's efforts at this juncture. It would be premature to rule on any methodology that the state *might* use in its good faith effort to determine the true cost of obtaining basic necessities.

society will react more humanely than an uninformed [one]. Dickens's fables may represent the reality of human experience. We are not given visions of the future to guide our decisionmaking. We ought at least have a clear vision of the present." (*Matter of Rulemaking, N.J.A.C. 10:82-1.2, supra*, 566 A.2d at p. 1160.) California would blur the public's vision in order to avoid political accountability for its decisions. We should not permit it to do so.

I would affirm the judgment.